# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> GURBIR GREWAL, *et al.*, <br><br> *Defendants*. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Hon. Peter G. Sheridan, U.S.D.J.
Hon. Lois H. Goodman, U.S.M.J.
Civil Action No. 18-cv-10507

Oral Argument Requested

Motion Date: July 16, 2018

## CIVIL ACTION

## (ELECTRONICALLY FILED)

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

David H. Thompson*
Peter A. Patterson*
Haley N. Proctor*
J. Joel Alicea*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
*Pro hac vice forthcoming

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 4

ARGUMENT .................................................................................................... 7

I.     Plaintiffs Are Likely To Succeed on the Merits of Their
Second Amendment, Equal Protection, and Takings Claims.......................... 7

      A.     Plaintiffs Are Likely To Succeed on the
Merits of Their Second Amendment Claim. ........................................ 7

      B.     Plaintiffs are Likely To Succeed on the
Merits of Their Equal Protection Claim. ............................................ 26

      C.     Plaintiffs Are Likely To Succeed on the Merits of Their
Claim that Act A2761 Is an Unconstitutional Taking......................... 31

II.    Plaintiffs Will Suffer Irreparable Harm if the Court Denies Relief. ............. 37

III.   The Remaining Factors Favor Injunctive Relief. ......................................... 38

IV.   The Court Should Waive the Bond Requirement or Set Bond at a
Nominal Amount. .......................................................................................... 39

CONCLUSION ................................................................................................. 40

i

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                    <u>**Page**</u>

*Andrus v. Allard*, 444 U.S. 51 (1979) ........................................................35

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ...............................................7, 38

*Binderup v. Attorney Gen. United States of America*,
   836 F.3d 336 (3d Cir. 2016) .............................................................18, 20

*Borough of Palmyra, Bd. of Educ. v. F.C. Through R.C.*,
   2 F. Supp. 2d 637 (D.N.J. 1998)........................................................39, 40

*Brown v. Legal Found. of Washington*, 538 U.S. 216 (2003) .................31

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ................29

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016).............................10, 16

*Califano v. Westcott*, 443 U.S. 76 (1979) .................................................30

*Carson Harbor Vill., Ltd. v. City of Carson*, 353 F.3d 824 (9th Cir. 2004)............36

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)..............26

*Clark v. Jeter*, 486 U.S. 456 (1988)..........................................................26

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)..............38

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)......................... 1, 8, 9, 10, 12, 14, 15, 16, 17, 18

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ......................................14, 19

*Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017) .......9, 14, 25, 35, 36

*Elliott v. Kiesewetter*, 98 F.3d 47 (3d Cir. 1996)......................................39

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..................10, 18, 37

*Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015) ...........12

*Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014)..............9, 11, 13

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ...................................19

*Garcia v. Harris*, 2016 WL 9453999 (C.D. Cal. Aug. 5, 2016)...............28

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)..............8, 12, 14

*Hereas Materials Tech. LLC v. Pham*,
   2011 WL 13227724 (E.D. Pa. May 5, 2011).........................................39

*Horne v. Department of Agric.*, 135 S. Ct. 2419 (2015)..................31, 32, 33, 34, 36

*In re Trustees of Conneaut Park, Inc.*, 855 F.3d 519 (3d Cir. 2017) .................31, 32

*International Paper Co. v. United States*, 282 U.S. 399 (1931)..............................33

*Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014)..................9

*Jacob Ruppert, Inc. v. Caffey*, 251 U.S. 264 (1920)...................................35

*James Everard's Breweries v. Day*, 265 U.S. 545 (1924).......................................35

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013) ...............................................37, 38

*Kelo v. City of New London*, 545 U.S. 469 (2005) ....................................33

*Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016) ..............................................9, 12, 28

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ........................................29

*Koontz v. St. Johns Water Mgmt. Dist.*, 570 U.S. 606 (2013) .................................34

*Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971) .......................................37

*Lingle v. Chevron USA, Inc.*, 544 U.S. 528 (2005) ....................................31, 32, 33

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)...........33, 34

*Luis v. United States*, 136 S. Ct. 1083 (2016).............................................9

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ......................................29

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ......................7, 8, 9, 16, 26, 37

*Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380 (3d Cir. 2010)...........................28

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ....................................10, 11, 12, 14, 19

*Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806 (3d Cir. 1989)........................39

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)..............................16

*Pemberthy v. Beyer*, 19 F.3d 857 (3d Cir. 1994)...................................27

*Ramirez v. Commonwealth*, 94 N.E.3d 809 (Mass. 2018)......................................16

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) .......................................7

*Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*,
    561 F.2d 1327 (9th Cir. 1977) .............................................34

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ...............................34

*Rupp v. Becerra*, 2018 WL 2138452 (C.D. Cal. May 9, 2018)..............................35

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017)........................................30

*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) ............................................28, 29

*Stimmel v. Sessions*, 879 F.3d 198 (6th Cir. 2018) .................................................14

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002)......................................................................................32, 36

*Taylor v. Westly*, 488 F.3d 1197 (9th Cir. 2007) .......................................................38

*Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991)................................................39

*Tolchin v. Supreme Court of N.J.*, 111 F.3d 1099 (3d Cir. 1997) ............................27

*Toomer v. Witsell*, 334 U.S. 385 (1948) ...................................................................38

*United States v. Huet*, 665 F.3d 588 (3d Cir. 2012) .................................................14

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)...........................8, 19, 20

*United States v. Virginia*, 518 U.S. 515 (1996)...........................................21, 27, 28

*United States v. Welch*, 217 U.S. 333 (1910) ...........................................................32

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ........................18, 38

## Constitutional Provisions, Statutes, & Rules

U.S. CONST.

    amend. II .................................................................................................................7

    amend. V ...............................................................................................................31

    amend. XIV............................................................................................................26

N.J.S.A.

    § 2C:39-1(y)............................................................................................................4

    § 2C:39-3(j)..............................................................................................................4

    § 2C:39-5(f) .............................................................................................................4

Act 2761

    § 1(w)(4) ..................................................................................................................4

    § 1(y).........................................................................................................................4

    § 2.............................................................................................................................4

    § 5.............................................................................................................................5

    § 5(a) ......................................................................................................................33

    § 5(b).......................................................................................................................34

iv

§ 5(c) .......................................................................................................33

FED. R. CIV. P. 65 ...................................................................................39

## Other

Associated Press, *Ft. Hood Shooter Nidal Hasan Used Private,*
*Legally-Bought Pistol–Not Military Weapon–In Rampage*,
N.Y. DAILY NEWS (Nov. 7, 2009), https://goo.gl/s44fqQ ...................................24

Charles Remsberg, *Why One Cop Carries 145 Rounds of Ammo on the Job*,
POLICEONE (Apr. 17, 2013), https://goo.gl/6C4hmH.........................................25

CHRISTOPHER S. KOPER, ET AL., AN UPDATED ASSESSMENT OF THE FEDERAL
ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE,
1994–2003, REP. TO THE NAT'L INST. OF JUSTICE, U.S. DEP'T OF JUSTICE
(2004), *available at* https://goo.gl/44V3zp........................................................21

Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT
(Mar. 9, 2013), https://goo.gl/rPykp5 .................................................................11

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*,
78 ALB. L. REV. 849 (2015) ..............................................................11, 12, 13, 14

GUN DIGEST 2018 (Jerry Lee ed., 72d ed. 2017) ......................................................11

*Gun Shop Owner Shoots, Kills Man During Attempted Robbery*,
WIS TV (2012), https://goo.gl/RjbTZZ.............................................................25

Gus B. Sentementes & Julie Bykowicz, *Documents detail Cross Keys shooting*,
BALTIMORE SUN (Mar. 21, 2006), https://goo.gl/MqK7FL..........................17, 25

KNTV Staff, *LIST: Guns and Evidence From Las Vegas Shooter Stephen
Paddock*, ABC 13 (Jan. 19, 2018), https://goo.gl/bqJQbo .................................23

*Large Capacity Magazines*, GIFFORDS LAW CENTER, https://goo.gl/G29CkY .......10

Mairead McArdle, *Report: Parkland Shooter Did Not Use High-Capacity Maga-
zines*, NATIONAL REVIEW (Mar. 1, 2018), http://goo.gl/w8R8NA .....................24

Mark Obmascik, Marilyn Robinson & David Olinger, *Columbine–Tragedy
and Recovery: Officials Say Girlfriend Bought Guns*, THE DENVER POST
(Apr. 27, 1999), https://goo.gl/Di9k2q ...............................................................24

*Mass Shooting Incidents in America (1984–2012)*, CITIZENS CRIME COMMISSION,
https://goo.gl/u9BcVQ........................................................................................24

MASSAD AYOOB, THE COMPLETE BOOK OF HANDGUNS (2013).........................11, 25

Nieson Himmel, *Police Say Watch Shop Owner Kills 4th, 5th Suspects*, Los Angeles Times (Feb. 21, 1992), https://goo.gl/YBrqSK ............................17

Raymond W. Kelly, Annual Firearms Discharge Report 2011 (2011), *available at* https://goo.gl/kR13ND.......................................................25

Richard Winton, Rong-Gong Lin II, & Rosanna Xia, *Isla Vista Shooting: Read Elliot Rodger's Graphic, Elaborate Attack Plan*, Los Angeles Times (May 25, 2014), https://goo.gl/EPbc7H............................................................23

Rong-Gong Lin II, *Gunman Kills 12 at 'Dark Knight Rises' Screening in Colorado*, Los Angeles Times (July 20, 2012), https://goo.gl/bRzGYb..........24

Sarah Almukhtar, et al., *What Happened in the Parkland School Shooting*, New York Times (Apr. 24, 2018), https://goo.gl/Z4qbWG ..............................23

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To Bear Arms*, 49 Law & Contemp. Probs. 151 (1986) .........................22

Steve Almasy, *Newtown Shooter's Guns: What We Know*, CNN (Dec. 19, 2012), https://goo.gl/rpiLXj ..........................................................23, 24

*The UT Tower Shooting*, Texas Monthly, https://goo.gl/rwcXrT.........................24

Virginia Tech Review Panel, Mass Shootings at Virginia Tech (Aug. 2007), *available at* https://goo.gl/o8Lpam ...............................................24

**INTRODUCTION**

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court held that the Second Amendment takes certain policy choices "off the table," most notably the choice of prohibiting law-abiding citizens from defending "hearth and home" with arms that are in "common use . . . for lawful purposes like self-defense." *Id*. at 624, 635–36. Despite the clarity of this holding, New Jersey has now banned an entire class of arms that Americans overwhelmingly have chosen to use for the core lawful purpose of self-defense: ammunition magazines capable of holding more than 10 rounds of ammunition. By taking this action, New Jersey has flagrantly infringed the right of its citizens to defend themselves and their families.

The people of New Jersey have long enjoyed the right to defend their homes and their families using ammunition magazines capable of holding more than 10 rounds. In less than six months, absent a preliminary injunction from this Court, almost any citizen of New Jersey who continues to exercise that right will be committing a criminal act. A citizen in possession of such magazines will be stripped of this right, subject to 18 months' imprisonment, a $10,000 fine, and the opprobrium that comes from being labeled a criminal in the eyes of the law. To avoid this fate, New Jersey's residents must hand their personal property over to the State, render it useless, permanently alter it, or transfer it to another owner without any prospect of compensation from the State. That is the choice the State has offered its citizens:

1

forfeit a right citizens have long enjoyed or be prepared to spend time in prison.

The Constitution does not permit New Jersey to put its people to that choice. The Second Amendment protects the right of New Jersey's citizens to keep and bear arms for the defense of themselves, their families, and their homes, and as an essential part of that right, it safeguards their liberty to use firearms equipped with ammunition magazines that have long been a common feature of firearms across the country. Notwithstanding New Jersey's attempt to label magazines capable of carrying more than 10 rounds "large capacity," they are in fact conventional, standard-capacity magazines that, until recently, enjoyed a nearly uniform and unbroken history of being free of state or federal regulation. New Jersey has outlawed these magazines even though its actions will do nothing to stem the tide of gun-related violence or thwart the next mass shooting. Indeed, the State's magazine ban will if anything foster the very violence and mayhem it hopes to avoid by stripping law-abiding citizens of a tool for self-defense while having little if any practical effect on criminals. If the Second Amendment forbids the District of Columbia from banning handguns, it likewise forbids New Jersey from banning standard-capacity magazines.

But even if the Second Amendment permitted New Jersey's magazine ban, the State has violated bedrock principles of equal protection by capriciously exempting retired law-enforcement officers from the ban's reach. At the least, a flat ban on standard-capacity magazines is overly broad and disproportionate to the State's

2

asserted interests; at worst, it is utterly irrational. Basic remedial principles require invalidating the entire ban to ensure equal treatment among the State's citizens.

Nor does the Fifth Amendment permit New Jersey to compel its people to give up, disable, or permanently alter their personal property without any promise or avenue of obtaining just compensation. The Takings Clause was designed to prevent precisely this kind of arbitrary expropriation of private property by heavy-handed government officials. New Jersey's citizens have lawfully acquired standard-capacity magazines capable of holding more than 10 rounds of ammunition, and the State cannot suddenly and retroactively declare such property illegal.

The State of New Jersey has given its people less than six months to decide whether they will forfeit one of their liberties on pain of imprisonment. Only this Court can stop the State from putting its citizens to that choice. The Court should grant Plaintiffs' motion for a preliminary injunction, and it should preliminarily enjoin the 10-round magazine limit in its entirety. In the alternative, and at a minimum, Plaintiffs request that the Court enter an injunction that would allow individuals to lawfully retain magazines already in their possession without having to alter them, so long as they load them with at most 10 rounds of ammunition.

Finally, Plaintiffs respectfully request that the Court rule on their motion well in advance of end of the 180-day compliance period and, to the extent the Court grants an injunction, that it also toll the running of the compliance period while the

injunction is in place. This is necessary to ensure adequate time for Plaintiffs both to pursue this litigation without sacrificing their rights and to avail themselves of the disposal options provided by the statute if necessary. *See* Bach Decl. ¶¶ 9–14.

## BACKGROUND

Since 1990, New Jersey has criminalized the possession of a "large capacity ammunition magazine," which it previously defined to include "a box, drum, tube or other container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." N.J.S.A. §§ 2C:39-1(y), 2C:39-3(j). On June 7, 2018, the New Jersey legislature passed Assembly Bill No. 2761 (hereinafter "Act A2761"), which amended that definition to lower the threshold at which a magazine qualifies as "large capacity."

New Jersey now defines as "large capacity" any magazine capable of holding more than 10 rounds of ammunition (with a narrow, irrelevant exception). Act 2761 § 1(y), to be codified at N.J.S.A § 2C:39-1(y). Act A2761 also expanded the definition of "assault firearm" to include any semi-automatic rifle with a fixed magazine capacity exceeding 10 rounds, thereby generally criminalizing the possession of such firearms (again with a narrow exception that is not relevant here). Act 2761 § 1(w)(4), to be codified at N.J.S.A. § 2C:39-1(w)(4); N.J.S.A. § 2C:39-5(f). However, retired law-enforcement officers were specifically exempted from the ban on "large capacity" magazines. *See* Act A2761 § 2 (to be codified as a new section).

4

Governor Philip Murphy signed the Act into law on June 13, 2018. New Jersey residents who lawfully possessed arms that now qualify as "large capacity ammunition magazines" or "assault firearms" as of that date have approximately six months to make a choice: surrender their arms to the government, transfer them to another owner, destroy them, or permanently alter them so that they no longer fall within the scope of the ban. Act A2761 § 5.

On the same day that the Governor signed Act A2761 into law, Plaintiffs filed this lawsuit to vindicate their constitutional rights. Plaintiff the Association of New Jersey Rifle & Pistol Clubs, Inc. (the "ANJRPC") is a not-for-profit membership corporation, incorporated in the State of New Jersey in 1936, which represents the interests of target shooters, hunters, competitors, outdoors people, and other law-abiding firearms owners. Bach Decl. ¶¶ 2–3. With thousands of members in New Jersey, ANJRPC is a staunch defender of the right of its members to keep and bear arms and has many members who own or desire to purchase standard-capacity magazines that are subject to Act A2761's ban. *Id.* ¶¶ 3–7. Plaintiffs Blake Ellman and Alexander Dembowski are members. Ellman Decl. ¶ 5; Dembowski Decl. ¶ 7.

Mr. Ellman and Mr. Dembowski are both law-abiding citizens of New Jersey who do not qualify for any of the exceptions to the magazine ban. Ellman Decl. ¶¶ 2–3; Dembowski Decl. ¶¶ 2–3. Neither one, for instance, is a retired police officer. Ellman Decl. ¶ 10; Dembowski Decl. ¶ 12. Both have extensive firearms training

and experience with standard-capacity magazines. Mr. Ellman is a firearms instructor, range safety officer, armorer, and competitive shooter, and Mr. Dembowski served in the Marine Corps for 4 years before retiring from the armed forces. Ellman Decl. ¶ 4; Dembowski Decl. ¶ 4. While in the Marines, Mr. Dembowski spent a year as a Combat Marksmanship Instructor, which required an additional month of intensive training in firearms and magazines. Dembowski Decl. ¶ 5. He used 30-round magazines with his M-16 rifle and 15-round magazines with his Beretta 92 FS pistol during his time in the armed forces. *Id.* Now, Mr. Dembowski serves as Chief Range Safety Officer for a range in New Jersey, where he has routinely trained customers using 15-round magazines for both rifles and pistols. *Id.* ¶ 6.

Both Mr. Ellman and Mr. Dembowski own and desire to purchase standard-capacity magazines capable of holding as many as 15 rounds of ammunition. Ellman Decl. ¶¶ 6, 9; Dembowski Decl. ¶¶ 8, 11. They use these magazines for lawful purposes, including defending themselves in their homes. Ellman Decl. ¶ 7; Dembowski Decl. ¶ 9. But because of the threat of criminal prosecution under Act A2761, they will refrain from purchasing additional standard-capacity magazines and, absent preliminary injunctive relief, will be forced to transfer, render inoperable, permanently modify, or surrender to the police the standard-capacity magazines they currently own at the end of the 6-month grace period. Ellman Decl. ¶¶ 8–9; Dembowski Decl. ¶¶ 10–11.

**ARGUMENT**

A plaintiff seeking preliminary injunctive relief must demonstrate (1) a likelihood of success on the merits and (2) a prospect of irreparable injury if the injunction is not granted. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017). In addition, "the district court . . . should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* Here, all four factors favor issuing a preliminary injunction.

## I. Plaintiffs Are Likely To Succeed on the Merits of Their Second Amendment, Equal Protection, and Takings Claims.

Establishing likelihood of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not." *Id.* at 179. Although Plaintiffs bear the burden of demonstrating their entitlement to preliminary equitable relief, where the State bears the burden of proof on the "ultimate question," plaintiffs "must be deemed likely to prevail unless the Government has shown" that it can carry that burden. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

### A. Plaintiffs Are Likely To Succeed on the Merits of Their Second Amendment Claim.

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Because "the Framers and ratifiers of the

7

Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty," it applies to the States via the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010) (plurality opinion). In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment "protect[s] an individual right to use arms for self-defense." 554 U.S. 570, 616 (2008). *Heller* involved the District of Columbia's "general[ ] prohibit[ion]" on the possession of handguns, and the Supreme Court held that, because handguns are widely "chosen by Americans for self-defense in the home," "a complete prohibition of their use is invalid." *Id.* at 629. The same straightforward analysis applies here and requires invalidation of New Jersey's ban on standard-capacity magazines.

The Third Circuit has established "a two-pronged approach to Second Amendment challenges." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). "First, [courts] ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee . . . . [Second,] [i]f it does, [they] evaluate the law under some form of means-end scrutiny."[1] *Id.* The first prong is a "threshold inquiry" into whether the challenged conduct is protected by

---

[1] Plaintiffs reserve their right to argue in subsequent proceedings that a tiers-of-scrutiny approach is never appropriate in Second Amendment cases. *See Heller v. District of Columbia*, 670 F.3d 1244, 1271–85 (D.C. Cir. 2011) (*Heller II*) (Kavanaugh, J., dissenting).

the right to keep and bear arms. *Id.*

As to the first step, standard-capacity magazines are "Arms" within the meaning of the Second Amendment. "[W]ithout bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014); *see also Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring); *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1116–17 (S.D. Cal. 2017); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014). That commonsense conclusions "finds strong historical support" in Founding-era dictionary definitions of "Arms," *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), which an "important 1771 legal dictionary" broadly defined to include "any thing that a man wears for his defence, or takes into his hands, or useth . . . to cast at or strike another," *Heller*, 554 U.S. at 581 (quoting 1 A NEW AND COMPLETE LAW DICTIONARY). "[M]agazines and the rounds they contain are used to strike at another and inflict damage." *Kolbe*, 813 F.3d at 175. Thus, standard-capacity magazines are "Arms" as that term is used in the Second Amendment.

It follows that standard-capacity magazines are presumptively protected by the Second Amendment and that a regulation restricting their use infringes upon that protection. *Heller* emphasized that "the Second Amendment extends, *prima facie*,

9

to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 554 U.S. at 582; *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1027 (2016). The burden is therefore on the State to show that standard-capacity magazines are *not* protected by the Second Amendment. *See New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015); *Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011). The State cannot make that showing here.

*Heller* explained that "the sorts of weapons protected [by the Second Amendment] were those in common use." 554 U.S. at 627 (quotation marks omitted). Magazines capable of holding more than 10 rounds are undoubtedly in common use within the United States. They are legal under federal law and the laws of 43 States,[2] *see Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016) (Alito, J., concurring) (number of jurisdictions where an arm is legal is relevant to determining "common use"), and prior to the 1990s no State limited magazine capacity to 10 rounds. There are approximately 133 million magazines capable of holding more than ten rounds owned throughout the country, constituting about *half* of all the nation's magazines. Curcuruto Decl. ¶ 17. For instance, about two-thirds of the distinct models of

---

[2] *See Large Capacity Magazines*, GIFFORDS LAW CENTER, https://goo.gl/G29CkY (listing states with bans on standard-capacity magazines before New Jersey enacted Act A2761).

10

semiautomatic centerfire rifles listed in the 2018 GUN DIGEST are normally sold with standard magazines that hold more than 10 rounds of ammunition,[3] while the standard-issue magazines for many pistols—including the most popular and most commonly owned semiautomatic handguns—hold more than 10 rounds (usually between 15 and 17 rounds).[4] *See Fyock*, 25 F. Supp. 3d at 1275. The most popular rifle in the nation—accounting for approximately 60% of all civilian rifle sales and about a quarter of all firearms sold—comes standard with a magazine holding more than 10 rounds,[5] and Glock pistols, which are "hugely popular for . . . home and personal defense," typically come standard with magazines capable of holding more than 10 rounds.[6] Regardless of the metric one employs, standard-capacity magazines satisfy the common-use test, as both the Second Circuit and the D.C. Circuit have held. *See*

---

[3] GUN DIGEST 2018 at 441–49, 497–99 (Jerry Lee ed., 72d ed. 2013).

[4] *Id.* at 386–88 (listing and describing ubiquitous Glock semiautomatics, including models G17, G22, G23, G26, G27, G31, G32, G33, G34, G35, which have standard-issue magazines of 17 rounds or more); *id.* at 374 (Beretta handguns with standard-issue magazines of 17 rounds or more); *id.* at 375 (Bersa handguns, 17 rounds); *id.* at 418 (Dan Wesson, 21 rounds); *id.* at 386 (Fabrique Nationale, 17 rounds); *id.* at 408 (Smith & Wesson, 17 rounds); *id.* at 402 (Ruger, 17 rounds); *id.* at 380–81, 417–18 (CZ handguns, 16 to 20 rounds); *id.* at 384 (European American Armory, 18 rounds); *id.* at 408 (Sig Sauer, 16 rounds); *id.* at 414 (Taurus, 17 rounds); *id.* at 394 (Kel-Tec, 30 rounds).

[5] *See* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 859 (2015); Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar. 9, 2013), https://goo.gl/rPykp5.

[6] MASSAD AYOOB, THE COMPLETE BOOK OF HANDGUNS 90, 87 (2013).

*New York State Rifle & Pistol Ass'n, Inc.*, 804 F.3d at 255 ("Even accepting the most conservative estimates cited by the parties and by amici, the . . . magazines at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("There may well be some capacity above which magazines are not in common use but . . . that capacity surely is not ten."); *see also Kolbe*, 813 F.3d at 174 ("[T]he record in this case shows unequivocally that [magazines holding more than 10 rounds] are commonly kept by American citizens . . . . [T]hese magazines are so common that they are standard.").

These figures also suffice to show that standard-capacity magazines are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. The sheer number of standard-capacity magazines in the United States can be explained only by their overwhelmingly lawful use, since "[c]ommon sense tells us that the small percentage of the population who are violent gun criminals is not remotely large enough to explain the massive market for magazines of more than ten rounds . . . ." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 871 (2015); *see also Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 416 (7th Cir. 2015) (Manion, J., dissenting) ("The fact that a statistically significant number of Americans use . . . large-size magazines demonstrates *ipso facto* that they are used for lawful purposes."). As James Curcuruto, Director of Research and Market Development at the National Shooting Sports

12

Foundation, explains: "[D]etachable ammunition magazines are very popular and are commonly owned by millions of persons in the United States for a variety of lawful purposes, including, but not limited to, recreational and competitive target shooting, home defense, collecting and hunting." Curcuruto Decl. ¶ 13. There is no basis for concluding otherwise. *See Fyock*, 25 F. Supp. 3d at 1276, 1278.

Nor is there any historical tradition of banning standard-capacity magazines that would support Act A2761's magazine prohibition. In fact, the opposite is true: there is a nearly universal and unbroken tradition of Americans owning standard-capacity magazines *without* being subject to restrictions like New Jersey's. Firearms with the capacity to fire more than "ten rounds are older than the United States," originating with a sixteen-shooter firearm invented in 1580. Kopel, *supra*, at 851–52. "At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity," and the same was true "by the time ratification of the Fourteenth Amendment was completed in 1868," even though "it was solidly established that firearms with seventeen-round magazines were in common use." *Id.* at 864, 869. "Thus, the historical evidence of the key periods for original meaning strongly suggests that magazine bans are unconstitutional." *Id.* at 870.

Indeed, restrictions on magazine capacity did not appear before the Prohibition Era, and even then, they were rare and generally short-lived. In 1927, Michigan and Rhode Island banned certain firearms based on magazine capacity (but with

13

capacity limits higher than New Jersey's 10-round limit),[7] and both states had repealed those restrictions by the 1970s. *Id.* at 864. And unlike New Jersey, neither state prohibited the mere possession of certain magazines or prohibited magazines carrying more than 10 rounds. *Id.* at 865. The only magazine ban originating in the Prohibition Era that remains in some form today is the District of Columbia's. But even assuming that that law has been on the books long enough to qualify as "longstanding," *but see Drake v. Filko*, 724 F.3d 426, 450 & n.16 (3d Cir. 2013) (Hardiman, J., dissenting); *see also Stimmel v. Sessions*, 879 F.3d 198, 205 (6th Cir. 2018), that outlier example cannot possibly establish the kind of "historical tradition" required by *Heller*. 554 U.S. at 627; *see New York State Rifle & Pistol Ass'n, Inc.*, 804 F.3d at 257 n.73 (standard-capacity magazine ban was not entitled to presumption of validity attached to longstanding regulatory measures); *Heller II*, 670 F.3d at 1260 (same); *Duncan*, 265 F. Supp. 3d at 1119 (same). As the Third Circuit has warned, courts must "tread carefully" and "cautio[usly]" when determining the existence of a historical restriction on the right to keep and bear arms. *See United States v. Huet*, 665 F.3d 588, 602 (3d Cir. 2012). The foregoing evidence proves that

---

[7] Michigan's law limited ammunition capacity to sixteen rounds; Rhode Island's initially limited it to 12 rounds and later increased the limit to 14. Kopel, *supra*, at 864–65. In 1933, Ohio began requiring a special permit for the possession or sale of a semiautomatic firearm with an ammunition capacity of greater than eighteen rounds, but this law was not interpreted as a ban on the sale of any particular magazine or gun. *Id.* at 865. Ohio's law was repealed in 2014. *Id.*

the Government cannot carry its burden to show that such a tradition exists. Accordingly, the right to possess standard-capacity magazines is fully protected by the Second Amendment.

Once that is established, we move on to the second step of the *Marzzarella* test, which requires little discussion in this case. The State's magazine ban is identical in all relevant respects with the handgun ban in *Heller*, and that requires its invalidation regardless of which form of scrutiny applies. The D.C. handgun ban "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose [of self-defense]," *Heller*, 554 U.S. at 628; the same is true of New Jersey's magazine ban. The D.C. handgun ban "extend[ed], moreover, to the home, where the need for defense of self, family, and property is most acute," *id.*; the same is true of New Jersey's magazine ban. And "[f]ew laws in the history of our Nation have come close to the severe restriction of [the D.C. handgun ban]," *id.* at 629; the same is true of New Jersey's magazine ban. Like the D.C. handgun ban, "[u]nder any of the standards of scrutiny that [the Court] ha[s] applied to enumerated constitutional rights," New Jersey's magazine ban "fail[s] constitutional muster." *Id.* at 628–29. Under *Heller*, that is the end of the analysis.

The flat unconstitutionality of New Jersey's ban under *Heller* is reinforced by subsequent Supreme Court precedent. In *McDonald*, the Supreme Court described

15

*Heller*'s holding as a simple syllogism: having "found that [the Second Amendment] right applies to handguns," the Court therefore "concluded" that "citizens must be permitted to use handguns for the core lawful purpose of self-defense." 561 U.S. at 767–68 (quotation marks and brackets omitted). Then, in *Caetano*, the Court summarily and unanimously reversed a decision of the Massachusetts Supreme Judicial Court that had departed from this approach in upholding a ban on stun guns. The Massachusetts court got the message: "Having received guidance from the Supreme Court in *Caetano II*, we now conclude that stun guns are 'arms' within the protection of the Second Amendment. Therefore, under the Second Amendment, the possession of stun guns may be regulated, but not absolutely banned." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). In like manner, New Jersey's attempt to ban overwhelmingly popular ammunition magazines is an option that the Second Amendment simply takes "off the table." *Heller*, 554 U.S. at 636.

"It is no answer to say"—as Defendants likely will say—"that it is permissible to ban the possession of [standard-capacity magazines] so long as the possession of other [magazines] . . . is allowed." *Id.* at 629; *Caetano*, 136 S. Ct. at 1033 (Alito, J., concurring); *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom Heller*, 554 U.S. 570 (characterizing such an argument as frivolous). As with handguns, "[t]here are many reasons that a citizen may prefer a [standard-capacity magazine] for home defense," and the State cannot countermand that

16

decision. *Heller*, 554 U.S. at 629. As Professor Gary Kleck, an expert on the effect of gun control on violence, has explained: "[L]imiting magazine loading to ten rounds impairs a crime victim's ability to lawfully defend himself and others." Kleck Decl. ¶ 12. For example, a victim might confront multiple assailants, an assailant carrying multiple firearms or magazines, or an assailant carrying a magazine with more than 10 rounds of ammunition.

These are not speculative scenarios. "The 2008 National Crime Victimization Survey of the U. S. Bureau of Justice Statistics found that 797,139 violent crime incidents occurred in the U. S. in which the victims faced multiple offenders, and in 247,388 of these violent crimes the victim faced *four or more* offenders." *Id.* ¶ 13 (emphasis in original). Accounts of such chilling incidents abound.[8]

Even if victims confront only a single assailant, because "crime victims do not plan their victimizations and cannot know when or where they will be victimized," they are unlikely to carry multiple firearms or magazines, whereas criminals—who choose the time and place to attack—can and do come prepared with multiple firearms or magazines. *Id.* ¶¶ 16–17. And if the assailant for some reason only carries a single firearm and magazine, New Jersey's magazine ban favors the

---

[8] *See, e.g.*, Gus B. Sentementes & Julie Bykowicz, *Documents detail Cross Keys shooting*, BALTIMORE SUN (Mar. 21, 2006), https://goo.gl/MqK7FL; Nieson Himmel, *Police Say Watch Shop Owner Kills 4th, 5th Suspects*, LOS ANGELES TIMES (Feb. 21, 1992), https://goo.gl/YBrqSK.

17

criminal. "It is virtually a tautology that criminals will disobey the legal ban on [standard-capacity magazines] at a higher rate than noncriminals, so law-abiding citizens who desire a [standard-capacity magazine] will be less likely to illegally acquire one than criminals." *Id.* ¶ 19.

Ultimately, however, it matters not at all whether New Jersey's citizens have good reasons for choosing standard-capacity magazines. *Heller* made clear that, "*[w]hatever* the reason," if an arm is widely "chosen by Americans for self-defense in the home," "a complete prohibition of [its] use is invalid." 554 U.S. at 629 (emphasis added). That is true here, and New Jersey's complete prohibition on standard-capacity magazines must fall. *See Binderup v. Attorney Gen. United States of America*, 836 F.3d 336, 363–64 (3d Cir. 2016) (Hardiman, J., concurring in part and concurring in the judgment); *see also Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017); *Ezell*, 651 F.3d at 703.

Even if the Court concludes that *Heller* requires additional scrutiny of the ban, Act A2761 would not survive such scrutiny. As an initial matter, *Heller* rejected rational basis review for Second Amendment claims, 554 U.S. at 628 n.27; "[r]ather, when faced with . . . [a] Second Amendment challenge, [the Courts of Appeals] agree that some form of heightened scrutiny is appropriate." *Binderup*, 836 F.3d at 344. Here, strict scrutiny is required because the burden imposed on Plaintiffs' Second Amendment rights is severe.

18

The Third Circuit has held that laws that "implicate[ ] [a plaintiff's] interest in the defense of hearth and home"—as New Jersey's magazine ban does—transgress "the core protection of the Second Amendment." *Marzzarella*, 614 F.3d at 94. Two Courts of Appeals have previously held that standard-capacity magazine bans burden or likely burden the core of the right to keep and bear arms. *See New York State Rifle & Pistol Ass'n, Inc.*, 804 F.3d at 258; *Fyock v. Sunnyvale*, 779 F.3d 991, 999 (9th Cir. 2015). Under Third Circuit precedent, that argues in favor of applying strict scrutiny. *See Drake*, 724 F.3d at 436 (declining to apply strict scrutiny because the core of the right to keep and bear arms was not recognized by the court as implicated).

Moreover, *Marzzarella* strongly suggests that the type of burden imposed by Act A2761 warrants strict scrutiny. The *Marzzarella* Court thought it was a close question whether strict or intermediate scrutiny applied in that case, but it ultimately used intermediate scrutiny because the statute at issue "was neither designed to nor ha[d] the effect of prohibiting the possession of any class of firearms[;] it [wa]s more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights." 614 F.3d at 97. The opposite is true here: Act A2761 unambiguously has the "design[ ]" and "effect of prohibiting the possession of [a] class of [magazines]." *Id.*; *see New York State Rifle & Pistol Ass'n, Inc.*, 804 F.3d at 259–60. Unlike the statute in *Marzzarella*, which "prohibit[ed]

19

possession of only unmarked firearms, while leaving the possession of marked fire-arms untouched," 614 F.3d at 97, there is *no way* in which the average New Jersey citizen can possess standard-capacity magazines under Act A2761. That is exactly the kind of burden that triggers strict scrutiny under *Marzzarella*.

But if—contrary to *Heller* and *Marzzarella*—intermediate scrutiny were applied to this case, the result would still be the same: New Jersey's magazine ban is invalid. To survive intermediate scrutiny, Act A2761 must advance a governmental interest that is "more than just legitimate, either 'significant,' 'substantial,' or 'important,' " and in seeking to advance that interest, the statute "may not burden more [of the right to keep and bear arms] than is reasonably necessary." *Id.* at 98. "[T]he Government bears the burden of proof on the appropriateness of the means it employs to further its interest." *Binderup*, 836 F.3d at 353 (Opinion of Ambro, J.).

Here, it is abundantly clear that New Jersey has imposed a greater burden on the right to keep and bear arms than reasonably necessary to advance its purported public safety objectives. For nearly 30 years the State has limited magazine capacity to 15 rounds, and there is no reason to believe that any marginal benefit will be obtained by reducing that limit to 10. Indeed, we are not aware of any Parkland-type mass shootings taking place in New Jersey between the 1990 enactment of the old 15-round limit and the recent reduction of that limit to 10 rounds.

Even setting this point to the side, there is no reasonable fit between the State's

20

asserted interest and Act A2761's magazine ban. There is no "exceedingly persuasive" reason to believe that the ban will reduce violence involving firearms, *United States v. Virginia*, 518 U.S. 515, 533 (1996), including the horrific mass shootings that all New Jersey citizens should want to prevent. After Congress outlawed magazines holding more than 10 rounds between 1994 and 2004, a comprehensive report analyzing the effect of the nationwide ban for the U.S. Department of Justice could not "credit the ban with any of the nation's recent drop in gun violence," and "there ha[d] been no discernible reduction in the lethality and injuriousness of gun violence."[9] Indeed, the study found that had the ban continued beyond 2004, its "impact on gun violence [was] likely to be small at best, and perhaps too small for reliable measurement."[10] A state-level ban is certainly no *more* likely to be successful than the 1994 nationwide ban, given the ability of criminals to easily acquire standard-capacity magazines in other states where they are legal and the dramatic increase in the number of such magazines in circulation since 1994.[11]

One reason why magazine bans are ineffective is that criminals cannot be

---

[9] CHRISTOPHER S. KOPER, ET AL., AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE, 1994-2003, REP. TO THE NAT'L INST. OF JUSTICE, U.S. DEP'T OF JUSTICE 96 (2004), *available at* https://goo.gl/44V3zp.

[10] *Id.* at 97.

[11] *See id.* at 81 n.95; *compare id.* at 10 (estimating 25 million standard-capacity magazines available in the U.S. in 1995) *with* Curcuruto Decl. ¶ 17 (estimating 133 million magazines available today).

21

expected to follow them. This is not a novel proposition. In a passage Thomas Jefferson copied into his personal quotation book, the influential Italian criminologist Cesare Beccaria reasoned that laws forbidding the

> wear[ing] of arms . . . disarm[ ] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance?  . . . [Such a law] certainly makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder.

*See* Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To Bear Arms*, 49 LAW & CONTEMP. PROBS. 151, 154 (1986).

Another reason is that individual "[c]riminals rarely fire more than ten rounds in gun crimes." Kleck Decl. ¶ 20. One New Jersey-based study found that offenders did not fire a single shot in two-thirds of crimes in which they were armed with a handgun. *Id.* Moreover, "of all violent crimes in which handguns *were* fired, only 2.5–3.0% involved more than 10 rounds being fired by the offender." *Id.* (emphasis in original). The State's magazine ban is therefore unlikely to do anything to address the overwhelming majority (97% in the New Jersey study) of violent crimes in which the assailant is armed with a handgun, even assuming that criminals obey the law (which they do not).

Nor will the State's magazine ban prevent rare, mass shootings that *do* involve firing multiple rounds. In previous mass shootings, "the shooters did not need

22

[magazines carrying more than 10 rounds] to fire large numbers of rounds and kill or injure as many victims as they did" because they "(a) had multiple guns, (b) had multiple magazines, and/or (c) reloaded their guns without interference from others." *Id.* ¶ 25. There were 23 mass shootings in the United States between 1994 and 2013 that involved magazines capable of holding more than 10 rounds, and in *all* of those incidents, the shooter possessed multiple firearms or multiple magazines and "would have been able to fire large numbers of rounds without significant interruption, and wound large numbers of victims, even if they had not possessed [magazines carrying more than 10 rounds]. They could have simply switched guns or changed magazines in 2–4 seconds to continue firing." *Id*. To cite two more recent tragedies, in the 2017 Las Vegas shooting, Stephen Paddock had at least 24 firearms with him during the attack,[12] and Nikolas Cruz, the attacker at Marjory Stoneman Douglas High School in Parkland, Florida, used "countless magazines."[13] Other well-known mass-shootings, such as those at Columbine and Newtown, likewise involved multiple firearms and/or multiple magazines.[14] Indeed, in several of the most notorious mass

---

[12] KNTV Staff, *LIST: Guns and Evidence From Las Vegas Shooter Stephen Paddock*, ABC 13 (Jan. 19, 2018), https://goo.gl/bqJQbo.

[13] Sarah Almukhtar, et al., *What Happened in the Parkland School Shooting*, NEW YORK TIMES (Apr. 24, 2018), https://goo.gl/Z4qbWG.

[14] *See* Richard Winton, Rong-Gong Lin II, & Rosanna Xia, *Isla Vista Shooting: Read Elliot Rodger's Graphic, Elaborate Attack Plan*, LOS ANGELES TIMES (May 25, 2014), https://goo.gl/EPbc7H; Steve Almasy, *Newtown Shooter's Guns:*

shootings—such as Columbine, Virginia Tech, and Parkland—the shooters used 10-round magazines, either exclusively or as part of their arsenal, demonstrating the failure of a ban like New Jersey's to address the problem it is trying to solve.[15]

Thus, "[a] ban on [standard-capacity magazines] will have an inconsequential effect on reducing the number of killed or injured victims in mass shootings." Kleck Decl. ¶ 22.

By contrast, banning standard-capacity magazines *is* likely to seriously impede the ability of law-abiding citizens to defend themselves. As recounted above, a law-abiding victim confronting multiple assailants (as the victims in 800,000 violent crimes did in 2008), an assailant carrying multiple firearms or magazines (as mass shooters do), or an assailant carrying a magazine in violation of the State's 10-round

---

*What We Know*, CNN (Dec. 19, 2012), https://goo.gl/rpiLXj; Rong-Gong Lin II, *Gunman Kills 12 at 'Dark Knight Rises' Screening in Colorado*, LOS ANGELES TIMES (July 20, 2012), https://goo.gl/bRzGYb; Associated Press, *Ft. Hood Shooter Nidal Hasan Used Private, Legally-Bought Pistol–Not Military Weapon–In Rampage*, N.Y. DAILY NEWS (NOV. 7, 2009), https://goo.gl/s44fqQ; VIRGINIA TECH REVIEW PANEL, MASS SHOOTINGS AT VIRGINIA TECH 89 (Aug. 2007), *available at* https://goo.gl/o8Lpam; Mark Obmascik, Marilyn Robinson & David Olinger, *Columbine–Tragedy and Recovery: Officials Say Girlfriend Bought Guns*, THE DENVER POST (Apr. 27, 1999), https://goo.gl/Di9k2q; *The UT Tower Shooting*, TEXAS MONTHLY, https://goo.gl/rwcXrT.

[15] *See* Mairead McArdle, *Report: Parkland Shooter Did Not Use High-Capacity Magazines*, NATIONAL REVIEW (Mar. 1, 2018), http://goo.gl/w8R8NA; VIRGINIA TECH REVIEW PANEL, MASS SHOOTINGS AT VIRGINIA TECH 92 (Aug. 2007), *available at* https://goo.gl/o8Lpam; *Mass Shooting Incidents in America (1984–2012)*, CITIZENS CRIME COMMISSION, https://goo.gl/u9BcVQ.

limit (as one would expect lawbreakers to do) would be placed at a severe disadvantage, especially since most law-abiding citizens are unlikely to have multiple firearms or magazines on their person or near-at-hand in their homes.

Law-enforcement practices and data confirm that victims will often need to fire more than 10 rounds to defend themselves. Police departments typically issue handguns with magazines that hold more than 10 rounds.[16] And in 2011, for example, New York City police officers fired more than 10 rounds in 29% of incidents in which they fired their weapons to defend themselves and others.[17] Indeed, by granting retired police officers the right to continue using standard-capacity magazines, New Jersey has implicitly recognized that civilians will often need to resort to more than 10 rounds of ammunition in many encounters with criminals,[18] and New Jersey's magazine ban deprives them of that right to self-defense without any relation to the State's interest in public safety. The ban therefore fails intermediate scrutiny, and, *a fortiori*, fails strict scrutiny as well. *See Duncan*, 265 F. Supp. 3d at 1121, 1139–40 (granting preliminary injunction against standard-capacity magazine ban).

---

[16] *See* AYOOB, *supra*, at 87, 88–90.

[17] RAYMOND W. KELLY, ANNUAL FIREARMS DISCHARGE REPORT 2011 23 Fig. A.10 (2011), *available at* https://goo.gl/kR13ND.

[18] *See, e.g.*, Charles Remsberg, *Why One Cop Carries 145 Rounds of Ammo on the Job*, POLICEONE (Apr. 17, 2013), https://goo.gl/6C4hmH; *Gun Shop Owner Shoots, Kills Man During Attempted Robbery*, WIS TV (2012), https://goo.gl/RjbTZZ; Sentementes & Bykowicz, *supra*.

### B. Plaintiffs are Likely To Succeed on the Merits of Their Equal Protection Claim.

The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Because the principle of equal protection is concerned with treating similarly situated people equally, a state can violate equal protection by drawing impermissible distinctions among citizens even if, absent the impermissible distinction, the state would have the power to enact the statute in question. Thus, even if Act A2761 did not violate the Second Amendment, it would nonetheless have to satisfy the requirements of equal protection, which stand as an independent check on the exercise of state power.

"Classifications affecting fundamental rights are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). "[T]he right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty," *McDonald*, 561 U.S. at 778, and as demonstrated above, *see supra* pp. 9–15, standard-capacity magazines are fully protected by the Second

26

Amendment.[19] Because Act A2761 "establishes . . . classification[s] that implicate[ ] fundamental rights[,] . . . [it] must meet strict scrutiny analysis," *Tolchin v. Supreme Court of N.J.*, 111 F.3d 1099, 1114 (3d Cir. 1997), and it must be "narrowly tailored to serve a compelling state interest," *Pemberthy v. Beyer*, 19 F.3d 857, 870 n.18 (3d Cir. 1994) (quotation marks omitted).

But even under the more lenient intermediate-scrutiny test, the classifications drawn by Act A2761 are unconstitutional. Under intermediate scrutiny, Defendants must show "at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (alteration in original) (quotation marks omitted). "The burden of justification is demanding and it rests entirely on the State." *Id.* Its justification must be "exceedingly persuasive." *Id.*

Act A2761 exempts retired law-enforcement officers from its magazine ban. In doing so, the statute creates two distinct classifications subject to equal-protection analysis. First, it distinguishes between retired law-enforcement officers (who receive an exemption) and retired members of the armed forces (who do not). Second,

---

[19] Whether standard-capacity magazines are protected by the Second Amendment goes to step one of the *Marzzarella* test, and so long as the Court concludes (correctly) that step one is satisfied, strict scrutiny applies to Plaintiffs' equal protection claim because the claim implicates a fundamental right. That is true regardless of whether Act A2761 survives scrutiny under step two of the *Marzzarella* test.

it distinguishes between retired law-enforcement officers (who receive an exemption) and typical law-abiding New Jersey citizens (who do not). Both classifications involve persons similarly situated with respect to the statute. For purposes of the magazine ban, there are no relevant distinctions between (1) retired police officers and (2) retired members of the armed forces or law-abiding New Jersey residents *except* for the statute's special exemption (all are civilians). Thus, both classifications involve groups similarly situated in all relevant respects other than the distinction at issue. *See Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 394 (3d Cir. 2010); *Garcia v. Harris*, 2016 WL 9453999, at *4 (C.D. Cal. Aug. 5, 2016); *see also Kolbe*, 813 F.3d at 201 (Traxler, J., dissenting).

That distinction cannot survive review because it is not "substantially related to the achievement of" the State's interest in public safety, *Virginia*, 518 U.S. at 533, let alone *narrowly tailored* to achieving that interest. As shown above, *see supra* pp. 20–25, banning standard-capacity magazines does not advance the State's interest in public safety *at all*; in fact, it detracts from that interest by giving criminals an advantage over their victims. Permitting all law-abiding New Jersey citizens to possess standard-capacity magazines advances the State's interest in public safety just as much as permitting retired police officers to do so. As the Ninth Circuit has held, exempting retired police officers from a general firearms prohibition "bears no reasonable relationship to the stated legislative purpose" of the prohibition. *Silveira v.*

28

*Lockyer*, 312 F.3d 1052, 1091 (9th Cir. 2002) (Reinhardt, J.). "Rather, the retired officers exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs." *Id.* For that reason, the Ninth Circuit held that such an exemption fails *even rational-basis* review.

The State might contend that retired police officers are better trained at handling standard-capacity magazines than the average law-abiding New Jersey citizen, *see Kolbe v. Hogan*, 849 F.3d 114, 147 (4th Cir. 2017), but even if there is some meaningful distinction between knowing how to handle a 10-round magazine and knowing how to handle an 11–15-round magazine—a dubious proposition—New Jersey's classification would remain wildly disproportionate to the goal of ensuring public safety. After all, if the concern is that average citizens are not sufficiently trained to possess standard-capacity magazines, the logical response would be to require *that they be trained* before using such magazines, not to *totally ban* them from even possessing the magazines. Plaintiffs take no position here as to whether such a training requirement would be constitutional, but the existence of an obvious and far-less-restrictive alternative shows that the State "has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of [constitutionally protected conduct] in which petitioners wish to engage." *McCullen v. Coakley*, 134 S. Ct. 2518, 2537 (2014); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2781–82 (2014).

29

The distinction between veterans of the police force and veterans of the armed forces fails for the same reasons. Indeed, that distinction is even harder to justify than the distinction between retired police officers and the general public. Plaintiff Dembowski served for four years in the Marine Corps, where he received annual training on firearms and magazines. Dembowski Decl. ¶¶ 4–5. He also served for a year as a Combat Marksmanship Instructor, which required an additional month of intensive training in firearms and magazines. *Id.* ¶ 5. While in the Marines, Mr. Dembowski used 30-round magazines with his M-16 rifle and 15-round magazines with his Beretta 92 FS pistol. *Id.* He currently serves as Chief Range Safety Officer at a range in New Jersey, where he has routinely trained customers using 15-round magazines for both rifles and pistols. *Id.* ¶ 6. There is simply no rational basis for distinguishing between Mr. Dembowski and retired police officers with respect to their ability to possess and use standard-capacity magazines consistent with public safety. The same is true of retired members of the armed forces generally.

In these circumstances, the proper remedy is to "extend the coverage of the statute to include those who are aggrieved by the exclusion." *Califano v. Westcott*, 443 U.S. 76, 89 (1979). "Ordinarily, . . . extension [of an exception], rather than nul-lification, is the proper course." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1699 (2017) (quotation marks omitted). Under these well-established remedial principles, Act A2761's magazine ban must be invalidated both on its face and as applied to

30

military veterans such as Mr. Dembowski.

### C. Plaintiffs Are Likely To Succeed on the Merits of Their Claim that Act A2761 Is an Unconstitutional Taking.

Plaintiffs are likely to succeed on the merits of their claim that New Jersey's ban on possession of standard-capacity magazines violates the Takings Clause of the United States Constitution.

The Takings Clause of the Fifth Amendment, as incorporated against the States by the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." "While it confirms the State's authority to confiscate private property, the text of the Fifth Amendment imposes a condition on the exercise of such authority: 'just compensation' must be paid to the owner." *Brown v. Legal Found. of Washington*, 538 U.S. 216, 231–32 (2003); *see also In re Trustees of Conneaut Park, Inc.*, 855 F.3d 519, 525 (3d Cir. 2017). Because Act A2761 effects a taking of Plaintiffs' property without providing for just compensation for that property, it works an unconstitutional taking.

Act A2761 takes Plaintiffs' property because it dispossesses them of their lawfully acquired magazines. To begin, because they are personal property, the magazines covered by the ban are "property" within the meaning of the Takings Clause. *Horne v. Department of Agric.*, 135 S. Ct. 2419, 2425–26 (2015).

Property can be "taken" within the meaning of the Fifth Amendment in one of two ways: A "physical taking" occurs when the government appropriates or

otherwise physically dispossesses the owner of property. *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 537 (2005). A "regulatory taking" occurs when the government regulates the use of that property in a manner that "is tantamount to a direct appropriation or ouster." *Id.*; *see also Horne*, 135 S. Ct. at 2427; *In re Trustees of Conneaut Lake Park*, 855 F.3d at 525.

New Jersey's ban on the possession of lawfully-acquired property effects a physical taking of that property. Apart from a narrow exemption for a theoretical class of firearms that cannot be altered to accept fewer than eleven rounds, the law criminalizes the continued possession (after 180 days) of standard-capacity magazines that individuals lawfully acquired before the law's effective date.

Physical takings can assume a variety of forms, from a "direct appropriation" to "the functional equivalent of a practical ouster of the owner's possession." *Lingle*, 544 U.S. at 537 (quotation marks and alteration omitted) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992)). But the *sine qua non* of a physical taking is dispossession. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 n.19 (2002) (physical takings, unlike regulatory takings, "dispossess the owner"). For even where a property right is "only destroyed and ended, a destruction for public purposes may as well be a taking as would be an appropriation for the same end." *United States v. Welch*, 217 U.S. 333, 339 (1910). New Jersey's statute may provide owners a menu of options as to *how* they can be

32

dispossessed of their arms, but it is, at base, a ban on possession of lawfully-acquired property. It is therefore a taking, as an examination of each option demonstrates.

Individuals who are unable or unwilling to destroy, permanently alter, or transfer their arms must surrender them to the government. Act A2761 § 5(c). This "direct government appropriation . . . of private property" is "a paradigmatic taking requiring just compensation." *Lingle*, 544 U.S. at 537; *see also Horne*, 135 S. Ct. at 2428.

To avoid this appropriation, owners of banned arms may transfer their firearm or magazine to "any person or firm lawfully entitled to own or possess that firearm or magazine." Act A2761 § 5(a). The transfer of the arms effects "a practical ouster of the owner's possession," which also constitutes a *per se* taking, even though the government does not acquire the arms. The Supreme Court has repeatedly recognized that a *per se* taking occurs when the government provides for a third party to dispossess the owner of property, expressly rejecting arguments that takings occur only when the dispossession is at the government's own hand. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 n.9 (1982) (physical occupation); *International Paper Co. v. United States*, 282 U.S. 399, 408 (1931) (appropriation). For this reason, no one doubted that takings had occurred in *Kelo v. City of New London*, even though owners of the condemned parcels were given the option to sell their property to a private non-profit entity. 545 U.S. 469, 475 (2005). *Cf.*

33

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1004–05 (1984) ("[T]he deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking.").

Finally, owners of banned rifles and standard capacity magazines are given the options of rendering them inoperable or permanently altering them to accept 10 rounds or less. Act A2761 § 5(b). But the law is clear that the government cannot escape its obligations under the Fifth Amendment by affording owners such alternatives. In *Horne*, for example, the raisin growers could have "plant[ed] different crops," or "[sold] their raisin-variety grapes as table grapes or for use in juice or wine." 135 S. Ct. at 2430. Likewise, in *Loretto*, the owner could have converted her building into something other than an apartment complex. *See* 458 U.S. at 439 n.17. The Supreme Court rejected arguments that these options changed the nature of the takings in those cases, admonishing that "property rights 'cannot be so easily manipulated.' " *Horne*, 135 S. Ct. at 2430 (quoting *Loretto*, 458 U.S. at 439 n.17); *see also Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1329 (9th Cir. 1977) (finding a taking even where the owner was given an opportunity to keep its property by rehabilitating that property at its own expense and to the government's satisfaction). If nothing else, the use of the threat of uncompensated confiscation to force property owners to alter their property is an unconstitutional condition. *See Koontz v. St. Johns Water Mgmt. Dist.*, 570 U.S. 606–07 (2013).

34

Act A2761 is distinguishable from restrictions on the *use* of personal property that have been upheld against takings challenges. For example, in *Andrus v. Allard*, 444 U.S. 51 (1979), the Supreme Court held that a ban on the sale of previously lawful eagle products was not a taking. In doing so, it emphasized that it was "crucial that [the owners] retain[ed] the rights to possess and transport their property." *Id.* at 66. Likewise, in the Prohibition-era cases, the Supreme Court rejected takings challenges to restrictive liquor laws because the statutes restricted only the ability to sell lawfully acquired alcohol, not to continue to possess it. *See James Everard's Breweries v. Day*, 265 U.S. 545, 560 (1924) (upholding statute "prohibiting traffic in intoxicating malt liquors for medicinal purposes"); *Jacob Ruppert, Inc. v. Caffey*, 251 U.S. 264, 278–79 (1920) (upholding statute barring sales of liquor "for beverage purposes").

However it is characterized, New Jersey's ban constitutes a taking, whether of the physical or regulatory variety. As another federal court recently held when confronted with a similar ban in California, "whatever expectations people may have regarding property regulations, they 'do not expect their property, real or personal, to be actually occupied or taken away.' " *Duncan*, 265 F. Supp.3d at 1138 (quoting *Horne*, 135 S. Ct. at 2427); *but see Rupp v. Becerra*, 2018 WL 2138452, at *4 (C.D. Cal. May 9, 2018) (dismissing a similar takings challenge). Thus, "whatever might be the State's authority to ban the sale or use of magazines over 10 rounds, the

35

Takings Clause prevents it from compelling the physical *dispossession* of such lawfully-acquired private property without just compensation." *Duncan*, 265 F. Supp. 3d at 1138.

Although it takes private property, Act A2761 fails to fulfill New Jersey's "categorical duty to compensate" the owners of the banned arms. *Tahoe-Sierra*, 535 U.S. at 322. It makes no provision at all for government compensation. True, a property owner who chooses to transfer his arms to a third party may be able to obtain *some* compensation for those arms, but that is not what the Fifth Amendment requires. Instead, the Constitution requires "just compensation," which is "to be measured by the market value of the property at the time of the taking." *Horne*, 135 S. Ct. at 2432 (quotation marks omitted). Nothing in New Jersey's ban even suggests, let alone ensures, that the compensation a magazine owner receives for the potential sale of her property to a third party will reflect its fair market value. In fact, by compelling transfer by a fixed date and prohibiting possession by nearly everyone in the state, the law practically ensures that the owner will receive less than fair market value. Precisely to avoid such a result, the Takings Clause prevents "government attempts to lay the general public's burden of just compensation on third parties." *Carson Harbor Vill., Ltd. v. City of Carson*, 353 F.3d 824, 831 (9th Cir. 2004) (O'Scannlain, J., concurring).

Act A2761 takes Plaintiffs' standard-capacity magazines without securing

36

just compensation. Plaintiffs are therefore likely to succeed on the merits of their claim that it violates the Takings Clause.

## II.    Plaintiffs Will Suffer Irreparable Harm if the Court Denies Relief.

The conclusion that Plaintiffs have a reasonable probability of success on their constitutional claims compels the conclusion that Plaintiffs face irreparable injury in the absence of injunctive relief. It is well-accepted that the deprivation of a constitutional right constitutes irreparable harm. *See, e.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013). The Third Circuit has recognized this rule in the context of a variety of constitutional rights. *See, e.g.*, *id.* (First Amendment); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971) (Fourth Amendment). Rights under the Second Amendment should be treated no differently. *McDonald*, 561 U.S. at 780.

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights. . . . The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. Infringements of this right cannot be compensated by damages.

*Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (quotation marks and citation omitted).

Plaintiffs' alternative request for more limited preliminary injunctive relief—namely, the ability to retain their magazines unaltered but only load them with 10 rounds until their rights can be adjudicated—would unfortunately not protect them from the irreparable injury to their right to self-defense. But it is necessary to protect

37

them from a separate irreparable harm: the choice between incurring criminal liability and suffering an irreversible deprivation of their property. *See Taylor v. Westly*, 488 F.3d 1197, 1202 (9th Cir. 2007); *see also Toomer v. Witsell*, 334 U.S. 385, 392 (1948).

## III.    <u>The Remaining Factors Favor Injunctive Relief.</u>

The public interest and balance of equities likewise favor Plaintiffs given that Plaintiffs are likely to succeed on the merits of their constitutional claims. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), for "the enforcement of an unconstitutional law vindicates no public interest," *K.A. ex rel. Ayers*, 710 F.3d at 114. *See also Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017).

On the other side of the scale, Defendants suffer little harm, as they have no valid interest in enforcing New Jersey's unconstitutional ban and, as explained above, there is no substantial reason demonstrating it will advance public safety. The Supreme Court has concluded that the harm resulting from even an *erroneous* injunction is "not extensive" in the context of an as-yet unenforced criminal law that threatens constitutional rights. *Ashcroft v. ACLU*, 542 U.S. 656, 671 (2004). In that context, no ongoing prosecutions are disrupted, and the Government remains free to enforce other, related laws. *Id.*

Finally, the balance of the equities generally favors parties who seek to preserve the status quo. *See, e.g.*, *Hereas Materials Tech. LLC v. Pham*, 2011 WL 13227724, *1 (E.D. Pa. May 5, 2011); *see also Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 813 (3d Cir. 1989) (the "preservation of the status quo represents the goal of preliminary injunctive relief in any litigation"). Granting Plaintiffs the relief they seek will merely maintain the status quo—or minimize the change to the status quo—until the Court can adjudicate their claims that the ban violates their Second, Fifth, and Fourteenth Amendment rights.

## IV. The Court Should Waive the Bond Requirement or Set Bond at a Nominal Amount.

While Federal Rule of Civil Procedure 65 provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," the Third Circuit has recognized that the district court may sometimes dispense with that requirement. *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991). In "noncommercial cases" such as this one the court should "balance the equities of the potential hardships that each party would suffer as a result of a preliminary injunction" and may excuse the bond on that basis. *Elliott v. Kiesewetter*, 98 F.3d 47, 59–60 (3d Cir. 1996). "The court should also consider whether the applicant seeks to enforce a federal right and, if so, whether imposing the bond requirement would unduly interfere with that right." *Borough of Palmyra,*

39

*Bd. of Educ. v. F.C. Through R.C.*, 2 F. Supp. 2d 637, 646 (D.N.J. 1998). Here, Defendants will not suffer costs and damages from the proposed restraining order, while imposing a more than de minimis bond would unduly interfere with Plaintiffs' Second, Fifth, and Fourteenth Amendment Rights. Plaintiffs should therefore not be required to post security, or should be required to post only a nominal amount.

## CONCLUSION

This Court should issue a preliminary injunction prohibiting enforcement of Act A2761 or, in the alternative, permitting citizens to load their unaltered magazines with at least ten rounds of ammunition. This Court should also order that the 180-day compliance period is tolled while the injunction is in place.

Dated: June 21, 2018

Respectfully submitted,

David H. Thompson*
Peter A. Patterson*
Haley N. Proctor*
J. Joel Alicea*
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

s/Daniel L. Schmutter
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com

* *Pro hac vice* forthcoming

40