## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al.<br><br>   *Plaintiffs*,<br><br> v.<br>MATTHEW PLATKIN, et al.<br><br>   *Defendants*.<br>_____ | Civil Action No. 3:18-cv-10507-PGS-LHG |
| MARK CHEESEMAN, et al.<br><br>   *Plaintiffs*,<br><br> v.<br>MATTHEW PLATKIN, et al.<br><br>   *Defendants*.<br>_____ | Civil Action No. 3:22-cv-4360-PGS-LHG |
| BLAKE ELLMAN, et al.<br><br>   *Plaintiffs*,<br><br> v.<br>MATTHEW PLATKIN, et al.<br><br>   *Defendants*. | Civil Action No. 1:22-cv-4397-PGS-LHG |

**BRIEF OF *ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.* ("*ANJRPC*") AND *ELLMAN* PLAINTIFFS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com
*Attorneys for ANJRPC and Ellman Plaintiffs*

## <u>Table of Contents</u>

**INTRODUCTION** .............................................................................................. 1

**BACKGROUND** ................................................................................................. 5

**ARGUMENT** ................................................................................................... 19

I. The Firearms And Magazines That New Jersey Has Banned Are "Arms."                                                                          19

II. The Arms That New Jersey Has Banned Are Typically Possessed By Law Abiding Citizens For Lawful Purposes, Including Self-Defense. 21

III. There Is No Historical Tradition In This Country Of Banning Arms That Millions Of Law-Abiding Citizens Own For Lawful Purposes.

28

IV. The     Magazine     Ban     is     an     Unconstitutional     Taking.

35

**CONCLUSION** .................................................................................................. 41

# Table of Authorities

**Page(s)**

**Cases**

Andrus v. Allard, 444 U.S. 51 (1979)..............................................................46, 47

Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey, 910 F.3d 106 (3d Cir. 2018) ...........................................................................22

Association of New Jersey Rifle & Pistol Clubs v. Grewal, 2018 WL 4688345 (D.N.J. 2018) ...................................................................................20

Association of New Jersey Rifle and Pistol Clubs, Inc. v. Attorney General of New Jersey, No. 19- 3142 (3d Cir. Aug. 25, 2022)................................6

Brown v. Legal Found. of Washington, 538 U.S. 216 (2003) ...................................42

Caetano v. Massachusetts, 577 U.S. 411 (2016) ................................................26, 39

Carson Harbor Vill., Ltd. v. City of Carson, 353 F.3d 824 (9th Cir. 2004)..............49

Coalition of New Jersey Sportsmen v. Florio, 744 F. Supp. 602 (D.N.J. 1990)........12

District of Columbia v. Heller, 554 U.S. 570  (2008) ........................................passim

Duncan v. Bonta, 970 F.3d 1133 (9th Cir. 2020) ...................................31, 35, 36, 37

Duncan v. Becerra, 265 F. Supp. 3d 1106 (S.D. Cal. 2017) ................................47, 48

Duncan v. Bonta, No. 17-cv-1017-BEN (JLB), 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023)                                                                                 passim

Friedman v. City of Highland Park, 784 F.3d 406 (7th Cir. 2015). ...........................28

Horne v. Department of Agric., 135 S. Ct. 2419 (2015). ...................................passim

In re Trustees of Conneaut Park, Inc., 855 F.3d 519 (3d Cir. 2017)....................42, 43

International Paper Co. v. United States, 282 U.S. 399 (1931)..................................45

Jackson v. City & Cnty. of S.F., 746 F.3d 953 (9th Cir. 2014)..................................23

Jacob Ruppert, Inc. v. Caffey, 251 U.S. 264  (1920) ................................................47

James Everard's Breweries v. Day, 265 U.S. 545 (1924) .......................................... 47

Kelo v. City of New London, 545 U.S. 469  (2005) ................................................... 44

Kolbe v. Hogan, 849 F.3d 114, 129 (4th Cir. 2017) .................................................. 31

Koontz v. St. Johns Water Mgmt. Dist., 570 U.S. 606 (2013) ................................... 46

Lingle v. Chevron USA, Inc., 544 U.S. 528 (2005) ....................................... 42, 43, 44

Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) ....... 44, 45, 46

Lucas v. South Carolina Coastal Council, 505 U.S. 1003  (1992) ............................ 43

N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2128 (2022) ... passim

N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242 (2d Cir. 2015) .......... 31

Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency, 561
    F.2d 1327 (9th Cir. 1977) ................................................................................ 46

Rupp v. Becerra, 2018 WL 2138452 (C.D.D Cal. May 9, 2018) ............................... 47

Staples v. United States, 511 U.S. 600 (1994) ...................................................... 2, 24

Stenberg v. Carhart, 530 U.S. 914 (2000) ................................................................ 12

Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535
    U.S. 302  (2002) ......................................................................................... 43, 48

United States v. Welch, 217 U.S. 333 (1910) ........................................................... 43

**Statutes**

Act of July 8, 1932, Pub. L. No. 72-275, §§1, 14, 47 Stat. 650, 650, 652
    (1932), repealed by 48 Stat. 1236 (1934), currently codified as amended
    at 26 U.S.C. §§5801-72 ........................................................................................ 37

N.J.C. 2C:39-3(j) ..................................................................................................... 6, 7

N.J.S. 2C:39-1(w)(4) .............................................................................................. 7, 9

N.J.S. 2C:39-1(y) .................................................................................................... 6, 7

N.J.S. 2C:39-12 .................................................................................................. 6

N.J.S. 2C:39-3(j) ............................................................................................... 8

N.J.S. 2C:39-5(b) .............................................................................................. 8

N.J.S. 2C:39-5(f) ............................................................................ 7, 10, 11, 12

N.J.S. 2C:43-3(a)(2) ...................................................................................... 8, 12

N.J.S. 2C:43-3(b)(2) .......................................................................................... 8

N.J.S. 2C:43-6 ................................................................................................. 12

N.J.S. 2C:43-6(a)(2) .......................................................................................... 8

N.J.S. 2C:43-6(a)(4) .......................................................................................... 8

N.J.S. 2C:58-12 ............................................................................................... 11

N.J.S. 2C:58-4 ................................................................................................. 11

N.J.S. 2C:58-5 ................................................................................................. 11

N.J.S. 2C:58-5(b) ............................................................................................. 11

Pub. L. No. 103 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)) ............ 38

**Constitutional Provisions**

U.S. Const. amend. II .................................................................................... 21

U.S. Const. amend. V ..................................................................................... 41

U.S. Const. amend. XIV ................................................................................. 41

**Other Authorities**

Ben Johnson, ATF announces pistol brace ban affecting millions of gun
    owners, Salem News Online (Jan. 31, 2023) ........................................ 27

Brett Foote, There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB ........................... 25

Christopher S. Koper et al., An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Page 35 Markets & Gun Violence, 1994-2003 ........................................................................... 30, 38

Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation (July 20, 2022) ................................................................... 25

David B. Kopel, Rational Basis Analysis of "Assault Weapon" Prohibition, 20 J. Contemp. L. 381(1994) ........................................................ 14, 37

Flayderman's Guide to Antique American Firearms and Their Values 305 (9th ed. 2007) ................................................................................... 36

Fourth-Quarter 2020 Sales at 2, Ford (Dec. 2020) ...................................................... 26

Harold F. Williamson, Winchester: The Gun That Won The West 2831 (1952) ...... 36

Louis A. Garavaglia & Charles G. Woman, Firearms of the American West 18661894, (1984) ................................................................................ 35

Nicholas J. Johnson, et al., Firearms Law and the Second Amendment 463, 519 (2d ed. 2018) ................................................................................ 41

NSSF, Firearm Production in the United States 7 (2020) ......................................... 30

NSSF, Modern Sporting Rifle Comprehensive Consumer Report (July 14, 2022) ... 30

Phil Bourjaily, The Best Duck Hunting Shotguns of 2023, Field & Stream (Mar. 20, 2023) ................................................................................ 27

Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 6557 (2004), available at https://bit.ly/3wUdGRE ........................................................ 30

Wash. Post Staff, Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of AR-15 owners, https://wapo.st/3KrUouy (Mar. 26, 2023) .................................... 26

William English, PhD, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned 2 (May 13, 2022) ........................................ 25

# INTRODUCTION

Pursuant to Rule of Civil Procedure 56, *ANJRPC* Plaintiffs (18-cv-10507) and *Ellman* Plaintiffs (22-cv-4397) move for summary judgment of their claims and Defendants' defenses in these consolidated matters. For the reasons set forth below, including the undisputed material facts and argument, the Court should grant judgment in favor of these Plaintiffs. This motion is supported by the accompanying memorandum, declarations filed in this matter, and all other matters properly before the Court.

*ANJRPC* and *Ellman* Plaintiffs Raise Three Constitutional Challenges:

• *ANJRPC* Count I: New Jersey's prohibitions on magazines with a capacity of more than 10 rounds violate the Second Amendment.

• *ANJRPC* Count II: New Jersey's prohibitions on magazines with a capacity of more than 10 rounds violate the Takings Clause.

• *Ellman* Count I: New Jersey's prohibitions on so-called "assault firearms" violates the Second Amendment.

Plaintiffs are entitled to summary judgment on all three counts.

There are many difficult constitutional questions surrounding the regulation of firearms. Whether New Jersey may ban firearms and magazines owned by millions of law-abiding Americans for lawful purposes is not one of them. The Supreme Court made crystal clear just this past Term that "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,

1

142 S. Ct. 2111, 2128 (2022) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).  The firearms New Jersey has banned are more common than the most popular vehicle in the United States, and the feeding devices it has banned are more than ten times more common than that.

These are not newfangled innovations that demand novel government intervention. Semiautomatic rifles shotguns, and pistols have been around for generations, as have ammunition feeding devices that hold more than 10 rounds; and, as recently as just a few decades ago, it was common ground that these common arms are "lawful."  *Staples v. United States*, 511 U.S. 600, 612 (1994).  Slapping the term "assault firearm" on firearms owned by millions of Americans does not take them outside of the Second Amendment's protection.  Nor does labeling standard-issue magazines "large capacity ammunition feeding devices" change the fact that tens of millions of Americans own hundreds of millions of them as integral components of arms that they keep and use for self-defense and other lawful purposes like target shooting and hunting.  The arms that New Jersey has banned are not just in common use; they are ubiquitous.  That puts New Jersey's prohibitions profoundly out of step with our nation's history of regulating firearms.

The plain text is the starting point under *Bruen*, and *Bruen* made clear beyond cavil what the term "Arms" in the Second Amendment "covers":  all bearable "instruments that facilitate armed self defense."  142 S. Ct. at 2132; *see also Heller*, 554 U.S. at 582 ("[T]he

Second Amendment extends, prima facie, to all instruments that constitute bearable arms").

To be sure, the rule that all things that "constitute bearable arms" are *presumptively* protected, *see Bruen*, 142 S. Ct. at 2126, 2132, does not mean that the Second Amendment guarantees "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626. Some things that are presumptively protected under the broad *textual* definition of "arms" nevertheless may be prohibited consistent with the nation's historical tradition. But *Bruen* also made clear beyond cavil what that historical tradition is: While the Second Amendment protects the keeping and bearing "of weapons that are … 'in common use,'" it does not protect arms that "'are highly unusual in society at large.'" 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). Whatever else may be said of the arms New Jersey has banned, there can be no serious dispute that they are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.[1] Indeed, millions of law-abiding citizens possess the semiautomatic firearms New Jersey has banned in the tens of millions and the standard-issue magazines New Jersey has banned in the hundreds of millions.

New Jersey cannot deny that the arms it has banned are ubiquitous in modern America. It instead simply ignores that dispositive fact in favor of a meandering inquiry

---

[1] "Common use" is actually a misnomer. The Court was clear that it is *possession* for lawful purposes that matters regardless of how often, if ever, an arm is actually used.

3

into how dangerous those arms may be in the hands of someone bent on using them to commit a horrific crime. But courts cannot withhold constitutional protection based on the relative "dangerousness" of arms when used for *un*lawful purposes. The question under binding Supreme Court precedent is whether *law-abiding* citizens typically possess and use the arms at issue for law-abiding purposes. And when it comes to the exceedingly broad range of arms that New Jersey has banned, the answer is plainly yes.

Under the unambiguous holdings of the Supreme Court, that is the end of the analysis. There is no need to conduct any further historical inquiry, because the Supreme Court has already determined what the "historical tradition" of our nation is when it comes to efforts to ban arms: The government may not ban arms that are "in common use today." *Bruen*, 142 S. Ct. at 2143. When it comes to classes of arms (like the ones now banned in New Jersey) that law-abiding citizens *have* overwhelmingly chosen for lawful purposes, "American governments simply have not broadly prohibited the[ir] public carry," let alone their private possession. *Id.* at 2156.

In short, while there is a long historical tradition of law-abiding citizens possessing for lawful purposes the classes of arms that New Jersey now prohibits, there is no similar tradition of government regulation of these commonly owned arms— let alone of outright bans. New Jersey's laws cannot be reconciled with *Bruen* (or reality).

Nor does the Fifth Amendment permit New Jersey to compel its people to give up, disable, or permanently alter their personal property without any promise or avenue of

4

obtaining just compensation. The Takings Clause was designed to prevent precisely this kind of arbitrary expropriation of private property by heavy handed government officials. New Jersey's citizens have lawfully acquired standard capacity magazines capable of holding more than 10 rounds of ammunition, and the State cannot suddenly and retroactively declare such property illegal.

Plaintiffs are entitled to summary judgment declaring these prohibitions unconstitutional and enjoining their enforcement.

## **BACKGROUND**

### **New Jersey's Ban on Standard-Capacity Magazines**

Since 1990, New Jersey has criminalized the possession of what it calls a "large capacity ammunition magazine," which it defined to include "a box, drum, tube or other container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." N.J.S. 2C:39-1(y), N.J.C. 2C:39-3(j). On June 7, 2018, the New Jersey legislature passed Assembly Bill No. 2761 (hereinafter "Act A2761" or "Magazine Ban")[2], which (among other things) amended that definition to lower the threshold at which a magazine qualifies as "large capacity." The Governor signed the Magazine Ban into law on June 13, 2018.

---

[2] The full title of the act is an Act Concerning Firearms and Amending N.J.S. 2C:39-1, N.J.S. 2C:39-3, and N.J.S. 2C:39-12, and Supplementing Chapter 39 of Title 2C of the New Jersey Statutes.

And yet, "there simply is no such thing as a 'large capacity magazine.' It is a regulatory term created by the State, meaning no more than the maximum amount of ammunition the State has decided may be loaded into any firearm at one time." *Association of New Jersey Rifle and Pistol Clubs, Inc. v. Attorney General of New Jersey*, No. 19- 3142, at *9 (3d Cir. Aug. 25, 2022) (Matey, J. dissenting from Order remanding case back to the district court) (Dkt. 147-1); ); *Duncan v. Bonta*, No. 17-cv-1017-BEN (JLB), 2023 WL 6180472, at *2 (S.D. Cal. Sept. 22, 2023) (noting that states have defined large capacity magazines from seven to seventeen rounds and concluding that the term is "arbitrary and capricious" because of the "different numerical limits").

New Jersey now defines as "large capacity," and criminalizes the possession of, any magazine capable of holding more than *10* rounds of ammunition (with a narrow carve-out designed to accommodate a small class of tube-fed, low-powered .22-caliber semi-automatic firearms like the Marlin Model 60). Act A2761 §§1, 2, codified at N.J.S. 2C:39-1(y), N.J.S. 2C:39-3(j).

The same law altered the definition of "assault firearm" to include any semi-automatic rifle with a fixed magazine capacity exceeding 10 rounds, thereby generally criminalizing the possession of such firearms. *Id.* N.J.S. 2C:39-1(w)(4), N.J.S. 2C:39-5(f).

While state law provides a narrow exception for certain firearms purchased before the bill's effective date—namely for a theoretical class of firearms "incapable of being

6

modified to accommodate 10 or less rounds"—there is no general "grandfather clause" for firearms and magazines lawfully owned and possessed before the effective date, effectively turning an estimated one million New Jersey gun owners into criminals if they fail to follow the legislation's new mandates.

Instead, the law gave New Jersey residents lawfully in possession of a banned firearm or magazine prior to the effective date 180 days after the effective date to transfer their firearms or magazines, to render them inoperable, to permanently modify them to accept 10 rounds or less, or to voluntarily surrender them to Defendant Callahan or the chief of police of the municipality in which the owner resides. Act A2761 §7.

The law does not provide for surrendered firearms or magazines to be put to any particular use, apparently allowing the police unfettered discretion to destroy the arms.

Violating New Jersey's "assault firearm" ban is a crime of the second degree, punishable by between five and ten years' imprisonment and a fine of up to $150,000, with harsh minimum mandatory sentences with no judicial discretion. *Id.* N.J.S. 2C:39-5(b), N.J.S. 2C:43-3(a)(2), N.J.S. 2C:43-6(a)(2).

Violating the "large capacity ammunition magazine" ban is a crime of the fourth degree, punishable by up to 18 months' imprisonment and a fine of up to $10,000. *Id.* N.J.S. 2C:39-3(j), N.J.S. 2C:43-3(b)(2), N.J.S. 2C:43-6(a)(4).

## New Jersey's Ban on Common Semi-Automatic Firearms

Since 1990, New Jersey has criminalized the possession of certain common semi-

automatic firearms, which it defines by reference to a list of enumerated banned firearms as well as a list of prohibited features (the "Firearm Ban").

The Firearm Ban prohibits, effective May 1, 1990, a list of approximately 66 common semi-automatic rifles and shotguns. Semi-automatic firearms fire only a single round with one pull of the trigger. The Firearm Ban further prohibits:

> Any firearm manufactured under any designation which is substantially identical to any of the firearms listed above.

> A semi-automatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock.

N.J.S. 2C:39-1(w). These firearms are not "machine guns," which are fully automatic and continue to fire until the trigger is released or the firearm runs out of ammunition.

A firearm is "substantially identical," and therefore also banned, if it meets the following definition set forth in August 19, 1996 Attorney General Guidelines[3]:

> A semi-automatic firearm should be considered to be "substantially identical," that is, identical in all material respects, to a named assault weapon if it meets the below listed criteria:

> A. semi-automatic rifle that has the ability to accept a detachable magazine and has at least 2 of the following:

>> 1. a folding or telescoping stock;

>> 2. a pistol grip that protrudes conspicuously beneath the action of the weapon;

---

[3] Those guidelines are available at https://www.state.nj.us/lps/dcj/agguide/assltf.htm or in PDF at https://www.state.nj.us/lps/dcj/agguide/3assltf.pdf.

8

   3. a bayonet mount;

   4. a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

   5. a grenade launcher;

B. a semi-automatic pistol that has an ability to accept a detachable magazine and has at least 2 of the following:

   1. an ammunition magazine that attaches to the pistol outside of the pistol grip;

   2. a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

   3. a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

   4. manufactured weight of 50 ounces or more when the pistol is unloaded; and

   5. a semi-automatic version of an automatic firearm; and,

C. a semi-automatic shotgun that has at least 2 of the following:

   1. a folding or telescoping stock;

   2. a pistol grip that protrudes conspicuously beneath the action of the weapon;

   3. a fixed magazine capacity in excess of 5 rounds; and

   4. an ability to accept a detachable magazine.

N.J.S. 2C:39-5(f) pejoratively and incorrectly labels these firearms as "assault

firearms" and makes it unlawful for any person to "knowingly have in his possession an assault firearm . . . except if the assault firearm is licensed pursuant to N.J.S. 2C:58-5 . . . . ."[4] Indeed, the term is just as arbitrary as large capacity magazine is: "Prior to 1989, the term assault weapon did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of assault rifles so as to allow an attack on as many additional firearms as possible on the basis of undefined evil appearance." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation and quotations omitted); *Heller v. D.C. ("Heller II")*, 670 F.3d 1244, 1290 (D.C. Cir. 2011) (Kavanaugh J., dissenting) (calling DC's law "haphazard" because there was no rational for why certain rifles made the list and others did not).[5]

The license to possess common semi-automatic firearms under N.J.S. 2C:58-5(b) requires that an applicant demonstrate that he qualifies for a permit to carry a handgun

---

[4] The statute also provides two exceptions not applicable here. A person could have registered a banned firearm that was acquired prior to May 1, 1990. N.J.S. 2C:39-5(f). The window to register such firearm closed one year from the effective date of the 1990 ban, and such a registered firearm cannot be transferred or inherited. N.J.S. 2C:58-12. A person could also have rendered a banned firearm inoperative, N.J.S. 2C:39-5(f), which in light of the Second Amendment right to possess arms for self-defense makes this exception not relevant to this action.

[5] The statute also provides two exceptions not applicable here. A person could have registered a banned firearm that was acquired prior to May 1, 1990. N.J.S. 2C:39-5(f). The window to register such firearm closed one year from the effective date of the 1990 ban, and such a registered firearm cannot be transferred or inherited. N.J.S. 2C:58-12. A person could also have rendered a banned firearm inoperative, N.J.S. 2C:39-5(f), which in light of the Second Amendment right to possess arms for self-defense makes this exception not relevant to this action.

pursuant to N.J.S. 2C:58-4 and that a judge of the Superior Court of New Jersey "finds that the public safety and welfare *so require*." (Emphasis added.)

Upon information and belief, either zero or close to zero such licenses have been issued by the Superior Court since 1990, and Plaintiffs are not aware of any such license *ever* having been issued. Notably, Plaintiffs asked this question in interrogatories, and Defendants did not provide an answer.

The requirements for such a license "are so substantial that they create a *de facto* prohibition . . . . Any potential owner must qualify under two lengthy application procedures, and may be refused at any time the State determines such a license does not serve the public interest. This regulatory scheme vests unbridled discretion over the licensing process with the State." *Coalition of New Jersey Sportsmen v. Florio*, 744 F. Supp. 602, 608 (D.N.J. 1990).

Violating New Jersey's ban on common semi-automatic firearms is a crime of the second degree, punishable by between five and ten years' imprisonment and a fine of up to $150,000, with harsh minimum mandatory sentences with no judicial discretion. *Id.* N.J.S. 2C:39-5(f), N.J.S. 2C:43-3(a)(2), N.J.S. 2C:43-6.

Between the Firearm Ban's prohibition of the enumerated 66 long guns and "substantially identical" firearms, the Act effectively bans the acquisition of semiautomatic long guns that are commonly used for lawful purposes, including self-defense in the home. Although the Firearm Ban describes common semi-automatic firearms as "assault firearms," this is a gross and misleading misnomer. Common semi-

11

automatic firearms are a normal feature of lawful firearms possession in the United States.

Firearms such as these are spread throughout the country. Common semi-automatic firearms are legal under both federal law and the laws of at least 41 states.

The ubiquity of common semi-automatic firearms among law-abiding Americans demonstrates that they are used for lawful purposes, such as self-defense, hunting, competition, and target shooting.

In line with the widespread possession and use of common semi-automatic firearms, there is no longstanding or historical tradition of prohibiting such firearms. Firearm bans like this one were unknown in the United States before the twentieth century. Bans like New Jersey's are a recent phenomenon in American history. New Jersey, for example, had never banned commonly possessed firearms before the enactment of the Act in 1990.

The rifles and shotguns banned by the Firearm Ban have attributes that promote accuracy or otherwise promote their effective use. For example, under the Firearm Ban, a semi-automatic, centerfire rifle that simply has an ability to accept a detachable magazine is not an "assault firearm."  Nor is such a rifle with either a folding stock or a flash suppressor.  Under the Act's "two feature" test, however, this ordinary rifle becomes an "assault firearm" of the "substantially identical" variety by reason of having both of these features—features that promote efficient and effective use and transport of the firearm.

12

A "flash suppressor" reduces the visible flash of light produced by firing the rifle. This reduces the likelihood of momentarily blindness after firing at an assailant, and it may reduce an assailant's ability to pinpoint his potential victim's position when the potential victim fires a shot in low-light conditions. David B. Kopel, Rational Basis Analysis of "Assault Weapon" Prohibition, 20 J. Contemp. L. 381, 397 (1994).

A "folding stock" allows a rifle to be stored and transported more compactly, while a "telescoping stock" merely allows the user to adjust the overall length of the firearm to better suit their body size, the reach of their arms, and the bulk of the clothes they are wearing—in exactly the same manner that an adjustable seat post on a bicycle helps fit the bicycle to the rider.  Either aids in maneuvering around tight spaces in a home, aiding in self-defense. *Id*. at 398–99.

Detachable magazines assist a home defender in reloading and remedying firearm stoppages and malfunctions which can severely impair the ability of a homeowner to deploy his firearm for self-defense.

A protruding pistol grip better stabilizes a rifle or shotgun on the shoulder for improved accuracy and effectiveness in self-defense.

These features combine to allow law-abiding, responsible citizens to easily store a rifle or shotgun in their homes and, if need be, use it effectively to defend themselves.

None of the above features makes a firearm more powerful or dangerous; rather, they allow citizens who are under the extreme stress of having to deal with an armed assailant to defend themselves more effectively.   Prohibiting firearms with features that

13

promote their efficient and effective use infringes on the core Second Amendment right because it meaningfully limits the ability of law-abiding, responsible citizens to defend themselves in their own homes.

These firearms are commonly used for defensive purposes and are highly useful for self-defense. For example, semi-automatic rifles that are banned by the Firearm Ban allow individuals to accurately engage their assailants at distances further away than they would be able to with handguns, thus increasing the likelihood that the defender will survive an encounter.

The Firearm Ban effectively bans the acquisition of common semi-automatic firearms by virtue of the enumerated list of 66 firearms and the expansive definition of "substantially identical" firearms. This is precisely the type of restriction found unconstitutional in *Heller*.

## The Magazine Ban and Firearm Ban Deprive Plaintiffs of Their Property and Prevent Them from Keeping or Acquiring Arms for Self-Defense

### Blake Ellman

Plaintiff Blake Ellman is an adult citizen and resident of New Jersey. He is not a retired law enforcement officer, and he does not fall within any of the other exceptions enumerated in New Jersey's ban on ammunition magazines capable of holding more than 10 rounds of ammunition or New Jersey's ban on common semi-automatic firearms.

Plaintiff Ellman is a firearms instructor, range safety officer, armorer, and competitive shooter.

Prior to the effective date of Magazine Ban Plaintiff Ellman lawfully owned and kept in New Jersey ammunition magazines that qualified as "large capacity ammunition magazines" under the amended law because they were capable of holding more than 10 but fewer than 16 rounds of ammunition. Mr. Ellman owned these magazines for lawful purposes, including self-defense in the home. But for the newly enacted ban, Plaintiff Ellman would have continued to own and keep these magazines in his New Jersey home. Instead, Mr. Ellman was forced to, in some instances, transfer non-compliant magazines and purchase new replacement magazines at considerable cost and in other instances, spend money to permanently modify other magazines thereby significantly impairing their value.  Further, since the ban went into effect, Mr. Ellman has purchased several new pistols for which he was required to pay money to permanently modify the magazines down to 10 rounds prior to receiving them in New Jersey.

If it were lawful, Plaintiff Ellman would also acquire new magazines capable of holding more than 10 rounds of ammunition. Because of New Jersey's ban and the associated criminal penalties, he refrains from doing so.

Plaintiff Ellman also wishes to own one or more of the common semi-automatic firearms New Jersey bans for lawful purposes, including self-defense in the home. In particular, Plaintiff Ellman would choose a banned rifle as an option for home defense because, as an experienced firearm owner and instructor, he believes that these common semi-automatic rifles are ideally suited to his home defense needs. But for the ban,

15

Plaintiff Ellman would acquire and keep one or more banned rifles in his New Jersey home. Because of New Jersey's ban and the associated criminal penalties, he refrains from doing so.

Plaintiff Ellman would apply for a license to possess common semi-automatic firearms, but he knows that such an attempt would be futile and he would be denied.

## Marc Weinberg

Plaintiff Marc Weinberg is an adult citizen and resident of New Jersey. He is not a retired law enforcement officer, and he does not fall within any of the other exceptions enumerated in New Jersey's ban on ammunition magazines capable of holding more than 10 rounds of ammunition.

Plaintiff Marc Weinberg lawfully owned and kept in New Jersey ammunition magazines that qualified as "large capacity ammunition magazines" under the amended law because they were capable of holding more than 10 but fewer than 16 rounds of ammunition. Mr. Weinberg owned these magazines for lawful purposes, including self-defense in the home. But for the newly enacted ban, Plaintiff Weinberg would have continued to own and keep these magazines in his New Jersey home. Instead, Mr. Weinberg was forced to sell these magazines at a substantial loss. Further, since the ban went into effect, Mr. Weinberg has purchased two new pistols for which he was required to pay money to permanently modify the magazines down to 10 rounds prior to receiving them in New Jersey.

If permitted to do so, Plaintiff Weinberg would also acquire new magazines capable of holding more than 10 rounds of ammunition. Because of New Jersey's ban and the associated criminal penalties, he refrains from doing so.

## Thomas Rogers

Plaintiff Thomas Rogers is an adult citizen and resident of New Jersey. He does not fall within any of the exceptions enumerated in New Jersey's ban on common semi-automatic firearms. Plaintiff Rogers is a long time, experienced firearms owner, having owned and responsibly used firearms for more than 40 years.

Plaintiff Rogers wishes to own common semi-automatic firearms for lawful purposes, including self-defense in the home. In particular, Plaintiff Rogers would choose a common semi-automatic shotgun as an option for home defense because, as an experienced firearm owner, he believes that a common semi-automatic shotgun is ideally suited to his home defense needs. But for the ban, Plaintiff Rogers would acquire and keep one or more common semi-automatic firearms in his New Jersey home. Because of New Jersey's ban and the associated criminal penalties, he refrains from doing so.

Plaintiff Rogers would apply for a license to possess common semi-automatic firearms, but he knows that such an attempt would be futile and he would be denied.

## *Association of New Jersey Rifle & Pistol Clubs*

Plaintiff ANJRPC has many members, including Plaintiffs Ellman and Weinberg, who owned and kept in New Jersey ammunition magazines that qualified as "large

17

capacity" or firearms that qualified as "assault firearms" due to their magazine capacity under the revised definitions of those terms enacted by Act A2761. But for the law, ANJRPC members would have continued to possess these magazines and firearms in New Jersey for lawful purposes, including self-defense in the home.

Plaintiff ANJRPC also has numerous members who wish to acquire—and but for the newly enacted law would acquire—for purposes of self-defense or other lawful purposes a magazine that qualifies as a "large capacity ammunition magazine" or a firearm that qualifies as an "assault firearm" due to its magazine capacity under the revised definitions of those terms enacted by Act A2761.

Plaintiff ANJRPC has members, including Plaintiffs Ellman and Rogers, who wish to acquire—and but for the ban would acquire— common semi-automatic firearms for purposes of self-defense in the home or other lawful purposes. Such members would apply for a license to possess common semi-automatic firearms, but they know that such an attempt would be futile and they would be denied.

Additional facts as to which Plaintiffs contend there is no material dispute are set forth in the accompanying Statement of Undisputed Material Facts.

## ARGUMENT

**I.    The Firearms And Magazines That New Jersey Has Banned Are "Arms."**

While the framework for addressing flat bans on a class of arms may not have been pellucid when this Court decided *Association of New Jersey Rifle & Pistol Clubs v. Grewal*, 2018 WL 4688345 (D.N.J. 2018) (*ANJRPC I*), which applied intermediate scrutiny to New Jersey's ban on magazines in excess of 10 rounds, there is no longer any room for debate.  The Supreme Court made clear just last year that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126.  After *Bruen*, then, the first question a court must ask in a case implicating the right to keep and bear arms is whether "the Second Amendment's plain text covers [the] conduct" the challenged law restricts.  *Id.*; *Range v. Atty. Gen. U.S. of Am.*, 69 F.4th 96, 101 (3d Cir. 2023).

Here, the answer to that question is easy.  The Second Amendment guarantees "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  As *Bruen* squarely held, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582).  New Jersey has prohibited "the people" whose rights the Second Amendment protects from keeping and bearing wide swathes of rifles, pistols, and shotguns.  Rifles, pistols, and shotguns plainly "constitute bearable arms," no matter what kind of grip, stock, ammunition feeding device, or other

19

features they may have. The right to keep and bear the firearms New Jersey has banned is thus "presumptively protect[ed]" by the Constitution. *Id.* at 2126.

To be sure, the Second Amendment does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. But that is because "historical tradition" reflects that some things that "constitute bearable arms"—*i.e.*, weapons that "are highly unusual in society at large"— nevertheless can be prohibited. *See Bruen*, 142 S. Ct. at 2143. That does not make those things any less "arms" under "the Second Amendment's definition," which covers *all* "instruments that facilitate armed self defense." *Id.* at 2132. The threshold inquiry thus begins and ends with the indisputable fact that the various firearms New Jersey has prohibited "constitute bearable arms," and hence are "presumptively protect[ed]." *Id.* at 2126, 2132.

That is no less true of the ammunition feeding devices New Jersey has banned. Indeed, the Third Circuit has already recognized that "[b]ecause ammunition magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("*ANJRPC I*") "); *Duncan*, 2023 WL 6180472, at *8. And rightly so, as it is not the firearm alone, but with ammunition *fed by the magazine*, that "facilitate[s] armed self-defense." *See Bruen,* 142 S. Ct. at 2132. Feeding devices

20

are not just holders of ammunition; they are an integral part of the mechanism that makes semiautomatic firearms work: When a user pulls the trigger, the round in the chamber fires, and the semiautomatic action combines with the magazine to feed a new round into the firing chamber. Without a device to feed ammunition to the firing chamber, modern semiautomatic firearms are little more than overengineered clubs. Citizens thus carry firearms equipped with magazines for the same reason they carry firearms loaded with ammunition: "[W]ithout bullets, the right to bear arms would be meaningless." *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014). That magazines and other ammunition feeding devices are integral to the functionality of the firearms citizens carry suffices to make them "presumptively protect[ed]" by the Constitution. *Bruen*, 142 S. Ct. at 2126.

## II.    The Arms That New Jersey Has Banned Are Typically Possessed By Law Abiding Citizens For Lawful Purposes, Including Self-Defense.

Because the firearms and feeding devices New Jersey has banned easily fit within "the Second Amendment's definition of 'arms,'" the state bears the burden of proving that they nonetheless can be banned "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2132. The state cannot meet that burden. The Supreme Court has already decided what "arms" may be banned consistent with "historical tradition": those that are not "'in common use today,'" i.e. today "*as opposed to* those that 'are highly unusual in society at large.'" *Id.* at 2143 (quoting *Heller*, 554 U.S. at 627) (emphasis added). That is the irreducible minimum of the Second

21

Amendment:  The government may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose."  *Heller*, 554 U.S. at 628.  In the context of a flat ban, then, the only question after *Bruen* is whether the arms that have been banned are "typically possessed by law-abiding citizens for lawful purposes."  *Id.* at 625.  If they are, then the state may not ban them, full stop.

Once again, the answer is easy.  The arms that New Jersey bans are the furthest thing from "highly unusual."  For starters, in connection with *ANJRPC* Plaintiffs' preliminary injunction application, this court recognized that the banned magazines are "in common use" and therefore "entitled to Second Amendment protection" *ANJRPC I*, 2018 WL 4688345 at *10.

Further, New Jersey bans many AR-platform rifles by name and/or by feature.  But the Supreme Court itself has described "AR-15 rifle[s]" as "widely accepted as lawful possessions."  *Staples*, 511 U.S. at 603, 612.  That should come as no surprise: Millions of Americans collectively own more than 24 million of these rifles.  William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 2 (May 13, 2022), https://bit.ly/3HaqmKv; NSSF, *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3zKDFh4. That exceeds the number of Ford F-150s, America's most popular automobile, in the country.  *See* Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB.  And "the numbers have

been steadily increasing." *Miller v. Bonta*, 542 F.Supp.3d 1009, 1020, 1022 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). "In 2018 alone[,] … 1,954,000 modern rifles were manufactured or imported into the United States." *Id.* at 1022. Again, that figure far exceeded the number of Ford F-series trucks sold in the same year. *See Fourth-Quarter 2020 Sales* at 2, Ford (Dec. 2020), https://ford.to/3H87Y5T (787,442 F-series trucks were sold in the U.S. in 2020). To state the obvious, a product lawfully owned and lawfully used by millions of Americans—and 20% of all gun owners, *see* Wash. Post Staff, *Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of AR-15 owners*, https://wapo.st/3KrUouy (Mar. 26, 2023)—is not "highly unusual in society at large." *See Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring in the judgment) (deeming stun guns, which "approximately 200,000 civilians" own, sufficiently "widely owned and accepted" to come within the Second Amendment's protection).

And New Jersey does not stop with AR-platform rifles. It goes on to prohibit not only many semiautomatic but also several commonly owned semiautomatic pistols and shotguns. To call these additional commonly owned firearms "highly unusual in society at large," *see Bruen*, 142 S. Ct. at 2143, is to deny reality. *See, e.g.*, Ben Johnson, *ATF announces pistol brace ban affecting millions of gun owners*, Salem News Online (Jan. 31, 2023), bit.ly/42gPhEN (explaining that ownership of "pistol braces," which are most commonly used for the types of pistols HB 450 bans, is estimated to be around 10 to 40

million); 86 Fed. Reg. 30,826, 30,845-46 (2021) (ATF estimate that 3 to 7 million stabilizing braces, designed for and commonly used with AR-style pistols of the sort the statute bans, were sold between 2013 and 2020); Phil Bourjaily, *The Best Duck Hunting Shotguns of 2023*, Field & Stream (Mar. 20, 2023), https://bit.ly/42nqTBX (listing multiple types of shotguns the statute bans).

Importantly, because the Firearm Ban is essentially a feature based prohibition, the correct way to understand commonality is not merely by model or platform but also by the commonality of features. Otherwise, New Jersey could simply ban any brand new firearm merely because no one owns it yet. That approach would be nonsensical, and it would be inconsistent with how the statute actually works. The whole point of the law is that New Jersey believes certain features in certain combination are harmful to public safety. It would be odd indeed not to test the constitutionality of the law using the same rubric.  *See also* Declaration of Emanuel Kapelsohn at 22-36 (discussing at length the various prohibited features, their nature, their lawful use and function, and their widespread commonality).

Further, New Jersey's emphasis on the unquestionably terrible crimes that a small number of criminals have committed misusing a small number of firearms the state now labels "assault firearms" has nothing to do with the relevant legal questions—*i.e.*, who the *typical* owners of such arms are and how *they* typically use them.  On those questions, the record is undisputed and indisputable:  Purchasers consistently report that self-

24

defense, hunting, and sport shooting are the most important reasons why they buy semiautomatic pistols and shotguns, not to mention rifles on the AR-15 platform. *See* English, *2021 National Firearms Report*, *supra*, at 33-34. This should come as no surprise; the types of arms New Jersey now bans "can be beneficial for self-defense because they are lighter than many rifles and less dangerous per shot than larger-caliber pistols or revolvers." *Friedman v. City of Highland Park,* 784 F.3d 406, 411 (7th Cir. 2015).

To say that is, again, not to deny that some people misuse these rifles for unlawful purposes. But that was equally true—indeed, arguably more so—in *Heller. See, e.g.,*. *Heller II,* 670 F.3d at 1286 (Kavanaugh, J., dissenting) (noting that "[t]here is no basis in *Heller* for drawing a constitutional distinction between semi-automatic handguns and semi-automatic rifles," and that handguns are used in crimes much more than rifles are). The *Heller* dissenters protested that handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals." 554 U.S. at 682 (Breyer, J., dissenting). The majority did not dispute that. It just found it irrelevant to whether they are constitutionally protected, as that question does not turn on whether arms are misused by criminals. It turns on whether law-abiding citizens own and use them for lawful purposes. So it was enough that handguns—the overwhelming majority of which today are semiautomatic—are typically possessed for lawful purposes. *See id.* at 624-25 (majority op.). What was true in *Heller* is no less true here given the

millions of Americans who own the arms New Jersey bans.  Just as in *Heller*, then, the flat ban here is flatly unconstitutional.

The same goes for the magazines New Jersey bans.  According to the most recent National Firearms Survey, approximately 39 million Americans—more than 10% of the nation's total population and more than 15% of all American adults—have owned feeding devices that hold more than ten rounds.  English, *2021 National Firearms Survey*, *supra*, at 22; *see* NSSF, *Firearm Production in the United States* 7 (2020), https://bit.ly/3jfDUMt (300+ million magazines sold from 1990 to 2018, 52% of which had a capacity larger than ten rounds).  Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Markets & Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 6557 (2004), *available at* https://bit.ly/3wUdGRE.

And the numbers are trending upward:  Recent data indicates that 75% of modern rifle magazines have a standard capacity of more than ten rounds.  NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://bit.ly/3GLmErS.  There are "over one hundred million."  *Duncan*, 2023 WL 6180472, at *2.

Simply put, while "[t]here may well be some capacity above which magazines are not in common use[,] … that capacity surely is not ten."  *Heller II*, 670 F.3d at 1261.

Court after court has acknowledged the ubiquity of these products in modern America.  *See, e.g.*, *Duncan v. Bonta*, 970 F.3d 1133, 1142 (9th Cir. 2020) ("One estimate based in part on government data shows that from 1990 to 2015, civilians possessed about

115 million LCMs out of a total of 230 million magazines in circulation."); *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) (en banc) ("46% of all magazines owned"); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("[A]bout 25 million large-capacity magazines were available in 1995" and another "nearly 50 million such magazines … were approved for import by 2000[.]").

The accompanying Declaration of Emanuel Kapelsohn not only illustrates the ubiquity of semi-automatic rifles, such as AR and AK platform rifles, but also demonstrates the integral role that millions of magazines holding more than 10 rounds play in millions of semi-automatic rifles and handguns nationwide. Kapelsohn Dec., para. 29-38. Moreover, Kapelsohn details the multiple lawful uses, including self-defense, to which such arms and magazines are regularly put by law-abiding individuals. *Id* at para. 36-47.

But the situation is even worse for New Jersey given that the so-called "assault firearm" law is largely feature based. Even though the law bans a series of enumerated arms, the ban further sweeps in large numbers of protected arms through its feature based test (e.g. folding stock, flash suppressor, etc.).

The Kapelsohn Declaration details how the banned features are widely useful for law abiding individuals for lawful purposes, not merely on the statutorily enumerated firearms platforms, but generally. *Id*. at para. 48-72. In this regard, the commonality test from *Heller* and *Bruen* is doubly devastating for a feature based law such as New Jersey's.

III.    **There Is No Historical Tradition In This Country Of Banning the Kinds of Arms That New Jersey Has Banned.**

The Court can and should end its analysis there.  "[T]he traditions of the American people … demand[] our unqualified deference," *Bruen*, 142 S. Ct. at 2131, and the tradition of the American people is that law-abiding citizens may keep and bear arms that are commonly possessed for lawful purposes like self-defense.  In the context of a flat ban on the acquisition or even possession of classes of arms, that *is* the historical test— *i.e.*, the key inquiry under *Bruen*—and it forecloses the state's effort to ban these commonly possessed arms.  After all, a state may not prohibit what the Constitution protects.

Nevertheless, even if further historical inquiry were necessary, New Jersey cannot come close to meeting its burden of demonstrating any historical tradition of prohibiting firearms capable of firing more than ten rounds without reloading.  Indeed, the very fact that millions of Americans have chosen these arms in the tens of hundreds of millions confirms that there is not, and never has been, any tradition of banning them.  To the contrary, the historical record reveals a long tradition of welcoming technological advancements aimed at improving the speed, firing capacity, accuracy, and functionality of firearms kept and born by civilians.  *See, generally,* Declaration of Ashley Hlebinsky.

This is consistent with exactly what *Heller* and *Bruen* held:  The only types of arms that states and municipalities have historically restricted in this country are those

28

sparingly chosen by law-abiding citizens for lawful purposes but overwhelmingly chosen by criminals for illicit ends—in other words, weapons that were *both* dangerous *and* unusual.

To be sure, there are historical laws that prohibited the carrying of arms that fit that description.  But the Supreme Court has already determined the import of the fact "that colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons'": "[E]ven if these colonial laws prohibited the carrying of [certain class of arms] because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today."  *Id.* at 2143 (quoting *Heller*, 554 U.S. at 627).  And "[a]part from a few late-19th century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense."  *Id.* at 2156.  They instead confined themselves to prohibiting only those arms that are "*not* typically possessed by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 625 (emphasis added).

Consistent with that long-standing practice, there simply is no historical tradition of banning the kinds semiautomatic rifles, pistol, shotguns or feeding devices that New Jersey has banned.  Indeed, even today, New Jersey's extreme approach is an outlier; the vast majority of states continue to respect the rights of their citizens to keep and bear ubiquitous semiautomatic firearms and standard-capacity feeding devices.

29

The lack of any tradition supporting the state's ban is certainly not owing to any "dramatic technological changes." *Bruen*, 142 S. Ct. at 2132. Firearms capable of firing more than ten rounds without reloading are not modern innovations, and neither are ammunition feeding devices up to that task. "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580." *Duncan*, 970 F.3d at 1147. Several such arms pre-dated the Revolution, some by nearly a hundred years. For example, the popular Pepperbox-style pistol could "shoot 18 or 24 shots before reloading individual cylinders," and the Girandoni air rifle, which "had a 22-round capacity," "was famously carried on the Lewis and Clark expedition." *Id.* As for "cartridge-fed" "repeating" firearms in particular— arguably the most direct forebears of the firearms New Jersey has now outlawed—they came onto the scene "at the earliest in 1855 with the Volcanic Arms lever-action rifle that contained a 30-round tubular magazine, and at the latest in 1867, when Winchester created its Model 66, … a full-size lever-action rifle capable of carrying 17 rounds" that "could fire 18 rounds in half as many seconds." *Id.* at 1148; *see* Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866-1894*, at 128 (1984). These multi-shot firearms were not novelties; they were ubiquitous among civilians by the end of the Civil War. "[O]ver 170,000" Winchester 66's "were sold domestically," *Duncan*, 970 F.3d at 1148; the successors that replaced the Model 66, the Model 73 and Model 92, sold more than ten times that amount in the ensuing decades, *id.*; and Winchesters were far from unique in this regard, *see* Harold F.

Williamson, *Winchester: The Gun That Won The West* 283 (1952) (Henry lever action rifle could fire 16 rounds without reloading); Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* 305 (9th ed. 2007) (14,000 Henry rifles were sold between 1860 and 1866).

Semiautomatic firearms with the features New Jersey has singled out are no novelty either.  They were *nineteenth*-century inventions, *see* Johnson, *Firearms Law and the Second Amendment* at 463, 519, and by the 1890s Luger was retailing a semi-automatic pistol with a detachable box-style magazine.  *See Duncan*, 970 F.3d at 1148.  Technology that old cannot be deemed a "dramatic technological change" in 2023.

While arms that could fire more than ten rounds without reloading would by no means have been "unforeseen inventions to the Founders," *Duncan*, 970 F.3d at 1147, laws prohibiting their possession most certainly would.   "At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity."  Kopel, *supra*, 78 Alb. L. Rev. at 864.  Indeed, at the founding, militia laws required "each citizen … to arm himself with *enough* ammunition: at least 20 rounds."  *Duncan*, 2023 WL 6180472, at *34 (emphasis in original) (collecting authorities).  That did not change anytime soon:  The very small number of laws regulating the firing capacity of semiautomatic firearms did not come around for another hundred-plus years, and, as discussed, none of those laws endured.  And not a single state restricted the manufacture,

31

sale, or possession of ammunition feeding devices *until the 1990s*.[6] So too with semiautomatic firearms. The first so-called "assault weapon" ban did not come about until 1989.

As for the federal government, it did not restrict semiautomatic arms, semiautomatic firing capacity, or magazine capacity until 1994, when Congress adopted a nationwide ban on certain semiautomatic firearms and ammunition feeding devices with a capacity of more than ten rounds. *See* Pub. L. No. 103-322, 108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)). And Congress allowed that law to expire in 2004 after a Justice Department study revealed that it had produced "no discernable reduction" in violence committed with firearms. Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence*, 1994-2003, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 96 (2004), available at https://bit.ly/3wUdGRE.

---

[6] One such law existed before the 1990s in the District of Columbia, but it was even more of an outlier than the handful of state laws just mentioned. In 1932, Congress passed a local D.C. law prohibiting the possession of firearms that "shoot[] automatically or semiautomatically more than twelve shots without reloading." Act of July 8, 1932, Pub. L. No. 72-275, §§1, 14, 47 Stat. 650, 650, 652 (1932), *repealed by* 48 Stat. 1236 (1934), *currently codified as amended at* 26 U.S.C. §§5801-72. This law was not understood to sweep up magazines or other ammunition feeding devices as an original matter. Indeed, when Congress enacted the National Firearms Act imposing stringent regulations on machine guns just two years later, it chose not to impose any restrictions on magazines. Pub. L. No. 73-474, 48 Stat. 1236 (1934). Nevertheless, after the District achieved home rule in 1975, the new D.C. government interpreted the 1932 law "so that it outlawed all detachable magazines and all semiautomatic handguns." Kopel, *supra*, 78 Alb. L. Rev. at 866.

To be sure, modern firearms and magazines like the ones New Jersey has banned are more accurate and capable of quickly firing more rounds than their founding-era predecessors.  But that does not make them any less linear descendants of the "small arms weapons used by militiamen … in defense of person and home" when the Second Amendment was ratified.  *Heller*, 554 U.S. at 624-25; *see also Caetano*, 577 U.S. at 416-17 (Alito, J., concurring in the judgment).  After all, it would be particularly perverse to confine the people to arms that are less accurate, efficient, and reliable for self-defense—which likely explains why no such historical tradition exists.  *See Bruen*, 142 S. Ct. at 2156.  Moreover, much of what New Jersey tries to claim about why the firearms it now bans and the magazines it now deems too "large" are supposedly different from arms long in common use could be said equally of the handguns *Heller* held protected.  That is precisely why our historical tradition focuses not on which arms are capable of doing the most damage in the hands of the small number of people bent on misusing them, but on which arms law-abiding citizens commonly conclude best serve their needs.  And far from treating technological advancements aimed at improving the accuracy, firing capacity, and functionality of firearms as nefarious developments that made firearms "too dangerous," history establishes time after time that those are precisely the kinds of things people have consistently looked for when determining how best to protect self, others, and home.

The Declaration of Ashley Hlebinsky outlines 600 years of firearms development that illustrates this exactly. Every innovation over the centuries has been geared toward shooting straighter, further, and faster.

Moreover, these technological changes were plainly known to the founding generation. For example, during the American Revolution, the colonists were keenly aware of the technological differences between the smooth bore Brown Bess musket and the far more advanced long rifle with a rifled barrel. *Id*. at para 17, 26, 38, 40, 42,

To the extent New Jersey seeks to excuse the relative novelty of its ban as owing to some "unprecedented societal concern[]," *Bruen*, 142 S. Ct. at 2132, that argument fails too. Even accepting the dubious proposition that there is some causal link between the arms New Jersey has banned and the horrific acts of crime on which it focuses, the unfortunate reality is that mass murder has been a fact of life in the United States for a very long time. Nevertheless, before "the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds," *Miller*, 542 F.Supp.3d at 1024, and there were almost no efforts to restrict the firing capacity of semiautomatic arms. This was not because such firearms were adopted only by militaries: The types of semiautomatic firearms and features New Jersey ban were popular with civilians long before they gained traction militarily. *See* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 463, 519 (2d ed. 2018).

34

Nor, more importantly, has there ever been any historical tradition of banning arms that *law-abiding* citizens typically keep and use for *lawful* purposes based on the damage they could inflict in the hands of someone bent on misusing them. To the contrary, our historical tradition is one of protecting the rights of law-abiding citizens to defend themselves and others against those who seek to do them harm.

See *Bruen*, 142 S. Ct. at 2132; *Heller*, 554 U.S. at 627. Because New Jersey's prohibitions fly in the face of that historical tradition, they violate the Second Amendment.

## IV.   The Magazine Ban is an Unconstitutional Taking.

The Takings Clause of the Fifth Amendment, as incorporated against the States by the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend V; U.S. Const. amend XIV. "While it confirms the State's authority to confiscate private property, the text of the Fifth Amendment imposes a condition on the exercise of such authority: 'just compensation' must be paid to the owner." *Brown v. Legal Found. of Washington*, 538 U.S. 216, 231–32 (2003); *see also In re Trustees of Conneaut Park, Inc.*, 855 F.3d 519, 525 (3d Cir. 2017). Because Act A2761 effects a taking of Plaintiffs' property without providing for just compensation for that property, it works an unconstitutional taking.

Act A2761 takes Plaintiffs' property because it dispossesses them of their lawfully acquired magazines. To begin, because they are personal property, the magazines covered

by the ban are "property" within the meaning of the Takings Clause. *Horne v. Department of Agric.*, 135 S. Ct. 2419, 2425–26 (2015).

Property can be "taken" within the meaning of the Fifth Amendment in one of two ways: A "physical taking" occurs when the government appropriates or otherwise physically dispossesses the owner of property. *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 537 (2005). A "regulatory taking" occurs when the government regulates the use of that property in a manner that "is tantamount to a direct appropriation or ouster." *Id.*; *see also Horne*, 135 S. Ct. at 2427; *In re Trustees of Conneaut Lake Park*, 855 F.3d at 525.

Physical takings can assume a variety of forms, from a "direct appropriation" to "the functional equivalent of a practical ouster of the owner's possession." *Lingle*, 544 U.S. at 537 (quotation marks and alteration omitted) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992)). But the *sine qua non* of a physical taking is dispossession. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 n.19 (2002) (physical takings, unlike regulatory takings, "dispossess the owner"). For even where a property right is "only destroyed and ended, a destruction for public purposes may as well be a taking as would be an appropriation for the same end." *United States v. Welch*, 217 U.S. 333, 339 (1910).

New Jersey's ban on the possession of lawfully-acquired property effects a physical taking of that property. Apart from a narrow exemption for a theoretical class of firearms that cannot be altered to accept fewer than eleven rounds, the law criminalizes

36

the continued possession (after 180 days) of standard-capacity magazines that individuals lawfully acquired before the law's effective date. And while New Jersey's statute may provide owners a menu of options as to *how* they can be dispossessed of their arms, none allows what is necessarily to avoid a taking—namely, the ability to continue to possess one's lawfully-acquired property. For starters the option of surrendering these arms to the government, Act A2761 § 5(c), is a "direct government appropriation . . . of private property" which is "a paradigmatic taking requiring just compensation." *Lingle*, 544 U.S. at 537; *see also Horne*, 135 S. Ct. at 2428.

To avoid this appropriation, owners of banned arms may transfer their firearm or magazine to "any person or firm lawfully entitled to own or possess that firearm or magazine." Act A2761 § 5(a). But transferring property *to someone else* effects "a practical ouster of the owner's possession," which also constitutes a *per se* taking. That is so regardless of whether the transfer is to someone other than the government. The Supreme Court has repeatedly recognized that a *per se* taking occurs when the government mandates a transfer of property from one private party to another. *See, e.g.*, *Kelo v. City of New London*, 545 U.S. 469, 475 (2005); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 n.9 (1982); *International Paper Co. v. United States*, 282 U.S. 399, 408 (1931); *cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1004–05 (1984) ("[T]he deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking.").

Nor does it make any difference that owners of banned rifles and standard capacity

37

magazines are given the options of rendering them inoperable or permanently altering them to accept rounds or less. Act A2761 § 5(b). The law is clear that the government cannot escape its obligations under the Fifth Amendment by affording owners such alternatives.

In *Horne*, for example, the raisin growers could have "plant[ed] different crops," or "[sold] their raisin-variety grapes as table grapes or for use in juice or wine." 135 S. Ct. at 2430. Likewise, in *Loretto*, the owner could have converted her building into something other than an apartment complex. *See* 458 U.S. at 439 n.17.

The Supreme Court rejected arguments that these options changed the nature of the takings in those cases, admonishing that "property rights 'cannot be so easily manipulated.'" *Horne*, 135 S. Ct. at 2430 (quoting *Loretto*, 458 U.S. at 439 n.17); *see also Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327,1329 (9th Cir. 1977) (finding a taking even where the owner was given an opportunity to keep its property by rehabilitating that property at its own expense and to the government's satisfaction). If nothing else, the use of the threat of uncompensated confiscation to force property owners to alter their property is a classic unconstitutional condition. *See Koontz v. St. Johns Water Mgmt. Dist.*, 570 U.S. 606–07 (2013).

All of that readily distinguishes the Magazine Ban from restrictions on the *use* of personal property that have been upheld against takings challenges. For example, in *Andrus v. Allard*, 444 U.S. 51 (1979), the Supreme Court held that a ban on the sale of previously lawful eagle products was not a taking. But in doing so, it emphasized that it

38

was "crucial that [the owners] retain[ed] the rights to possess and transport their property." *Id*. at 66. Likewise, in the Prohibition-era cases, the Supreme Court rejected takings challenges to restrictive liquor laws because the statutes restricted only the ability to sell lawfully acquired alcohol, not to continue to possess it. *See James Everard's Breweries v. Day*, 265 U.S. 545, 560 (1924) (upholding statute "prohibiting traffic in intoxicating malt liquors for medicinal purposes"); *Jacob Ruppert, Inc. v. Caffey*, 251 U.S. 264, 278–79 (1920) (upholding statute barring sales of liquor "for beverage purposes"). Here, by contrast, New Jersey leaves no option by which citizens may continue to possess their lawfully acquired property in the form that they acquired it. That is a taking.

As another federal court recently held when confronted with a similar ban in California, "whatever expectations people may have regarding property regulations, they 'do not expect their property, real or personal, to be actually occupied or taken away.' " *Duncan*, 265 F. Supp.3d at 1138 (quoting *Horne*, 135 S. Ct. at 2427); *but see Rupp v. Becerra*, 2018 WL 2138452, at *4 (C.D.D Cal. May 9, 2018) (dismissing a similar takings challenge). Thus, "whatever might be the State's authority to ban the sale or use of magazines over 10 rounds, the Takings Clause prevents it from compelling the physical *dispossession* of such lawfully-acquired private property without just compensation." *Duncan*, 265 F. Supp. at 1138.

Although it takes private property, Act A2761 fails to fulfill New Jersey's "categorical duty to compensate" the owners of the banned arms. *Tahoe-Sierra*, 535 U.S.

at 322. It makes no provision at all for government compensation. True, a property owner who chooses to transfer his arms to a third party may be able to obtain *some* compensation for those arms, but that is not what the Fifth Amendment requires. Instead, the Constitution requires "just compensation," which is "to be measured by the market value of the property at the time of the taking." *Horne*, 135 S. Ct. at 2432 (quotation marks omitted). Nothing in New Jersey's ban even suggests, let alone ensures, that the compensation a magazine owner receives for the potential sale of her property to a third party will reflect its fair market value. In fact, by compelling transfer by a fixed date and prohibiting possession by nearly everyone in the state, the law practically ensures that the owner will receive less than fair market value. Precisely to avoid such a result, the Takings Clause prevents "government attempts to lay the general public's burden of just compensation on third parties." *Carson Harbor Vill., Ltd. v. City of Carson*, 353 F.3d 824, 831 (9th Cir. 2004) (O'Scannlain, J., concurring).

Act A2761 takes Plaintiffs' standard-capacity magazines without securing just compensation. Plaintiffs are therefore entitle to summary judgment as to their claim that it violates the Takings Clause.

## **CONCLUSION**

In view of the foregoing, the Court should grant summary judgment declaring the

challenged bans unconstitutional and permanently enjoining their enforcement.

Dated: October 6, 2023

Respectfully submitted,

s/ Daniel L. Schmutter
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com