# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

      Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

      Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

      Defendants.

HON. PETER G. SHERIDAN


Civil Action No.
3:22-cv-04397

---

# COMBINED REPLY BRIEF IN IN SUPPORT OF STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 116
Trenton, New Jersey 08625
(609) 376-3202
Daniel.Vannella@law.njoag.gov
*Attorney for State Defendants*

Jeremy M. Feigenbaum, *Solicitor General*
Angela Cai, *Deputy Solicitor General*
Daniel Vannella, *Assistant Attorney General*

Christopher Ioannou
Nicholas Kant
Justine Longa
Jonathan Mangel
Rachel Manning
Tim Sheehan
   *Deputy Attorneys General*

Of Counsel And On The Brief

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................... i

TABLE OF AUTHORITIES .............................................................................. ii

PRELIMINARY STATEMENT ..........................................................................1

ARGUMENT .....................................................................................................4

I.    THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON
      PLAINTIFFS' SECOND AMENDMENT CLAIMS. ...................................4

   A.  The Second Amendment Does Not Protect LCMs Or Assault Weapons. ......4

      1.  Large-Capacity Magazines Are Not "Arms." ...........................................4

      2.  Neither LCMs Nor Assault Weapons Are In Common Use For Self
          Defense. ................................................................................................10

         a.  Courts Must Ask Whether A Weapon Is In Common Use For Self-
             Defense, Not Whether It Is Commonly Owned. ..................................11

         b.  There Is No Genuine Dispute That LCMs And Assault Weapons Are
             Not In "Common Use For Self-Defense". ..........................................17

   B.  New Jersey's Laws Are Consistent With Historical Traditions...................25

      1.  Unprecedented Societal Concerns and Dramatic Technological Changes
          Require Nuanced Analysis Of Historical Analogues...............................25

      2.  The State Laws Are Consistent With The Historical Tradition Of
          Regulating Particularly Dangerous Weapons. ........................................30

II.   THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON *ANJRPC*'S
      TAKINGS CLAIM..................................................................................43

CONCLUSION ...............................................................................................45

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*ANJRPC v. Att'y Gen. N.J.*,
  974 F.3d 237 (3d Cir. 2020)....................................................................44

*ANJRPC v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018).......................................................... 43, 44, 45

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d Cir. 2023) ........................................................33, 34, 37

*Aymette v. State*,
  21 Tenn. 154 (1840)................................................................................39

*Besett v. Hegg*,
  890 F. Supp. 2d 1076 (D. Minn. 2012).................................................22

*Bevis v. City of Naperville*,
  85 F.4th 1175 (7th Cir. 2023) ..................................................... *passim*

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.*,
  725 F.3d 293 (3d Cir. 2013)....................................................................15

*Brown v. Davenport*,
  596 U.S. 118 (2022)................................................................................14

*Brumback v. Ferguson*,
  No. 22-cv-3093, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023) ...................2, 5

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016)...........................................................................6, 15

*Capen v. Campbell*,
   No. 22-cv-11431, ___ F.Supp.3d ____, 2023 WL 8851005
   (D. Mass. Dec. 21, 2023) ...............................................................................*passim*

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
   No. 22-cv-951, ___ F.Supp.3d ____, 2023 WL 2655150
   (D. Del. Mar. 27, 2023)................................................................................. *passim*

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)........................................................................................ *passim*

*Fraternal Order of Police, Lodge 1 v. City of Camden*,
   842 F.3d 231 (3d Cir. 2016)....................................................................................22

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) ..................................................................................13

*Fyock v. Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015) ....................................................................................9

*Gamble v. United States*,
   139 S. Ct. 1960 (2019)............................................................................................35

*Garcia v. Att'y Gen. of U.S.*,
   553 F.3d 724 (3d Cir. 2009)....................................................................................44

*Hanson v. Dist. of Colum.*,
   No. 22-cv-2256, ___ F.Supp.3d ____, 2023 WL 3019777
   (D.D.C. Apr. 20, 2023) ........................................................ 2, 10, 17, 25, 30

*Hartford v. Ferguson*,
   No. 23-5364, 2023 WL 3836230 (W.D. Wash. June 6, 2023) ..........................2, 41

*Herrera v. Raoul*,
   No. 23-cv-532, ___ F.Supp.3d ____, 2023 WL 3074799
   (N.D. Ill. Apr. 25, 2023) ........................................................................................30

*Horne v. Dep't of Ag.*,
576 U.S. 350 (2013) ................................................................................45

*In re Asbestos Litig.*,
829 F.2d 1233 (3d Cir. 1987) ...................................................................22

*In re Continental Airlines*,
134 F.3d 536 (3d Cir. 1998) ....................................................................44

*Instinet Inc. v. Ariel (UK) Ltd.*,
No. 08-cv-7141, 2012 WL 4195391 (S.D.N.Y. Sept. 20, 2012) ...........22

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) ...................................................................43

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) ...................................................................15

*Koons v. Platkin*,
___ F.Supp.3d ____, No. 22-cv-7464, 2023 WL 3478604
(D.N.J. May 16, 2023) ..............................................................................25

*Lara v. Comm'r*,
No. 21-1832, 2024 WL 189453 (3d Cir. Jan. 18, 2024) ........................35

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ................................................................................45

*Maryland v. Wilson*,
519 U.S. 408 (1997) ................................................................................15

*McCullen v. Coakley*,
573 U.S. 464 (2014) ................................................................................30

*Mugler v. Kansas*,
  123 U.S. 623 (1887) ...........................................................................44

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ...................................................................... *passim*

*Nat'l Ass'n of Gun Rights v. Lamont*,
  No. 22-cv-1118, ___ F.Supp.3d ____, 2023 WL 4975979
  (D. Conn. Aug. 3, 2023) ............................................................ *passim*

*Nunn v. State*,
  1 Ga. 243 (1846) ...............................................................................40

*Ocean State Tactical LLC v. Rhode Island*,
  646 F. Supp.3d 368 (D.R.I. 2022) ................................... 2, 5, 10, 17, 44

*Or. Firearms Fed'n v. Kotek*,
  No. 22-cv-01815, ___ F.Supp.3d ____, 2023 WL 4541027
  (D. Or. July 14, 2023) ............................................................... *passim*

*Or. Firearms Fed'n, Inc. v. Brown,*
  644 F. Supp. 3d 782 (D. Or. 2022) ...............................................3, 21

*Range v. Att'y Gen.*,
  69 F.4th 96 (3d Cir. 2023) (en banc) ....................................... 8, 26, 30

*Read v. Profeta*,
  397 F.Supp.3d 597 (D.N.J. 2019) ....................................................22

*Staples v. United States*,
  511 U.S. 600 (1994).........................................................................21

*State v. Huntly*,
  25 N.C. 418 (1843) ...........................................................................15

v

*Timbs v. Indiana*,
 139 S. Ct. 682 (2019) ..................................................................................35

*Turicchi v. Quaid*,
 No. 18-cv-8908, 2019 WL 3213587 (C.D. Cal. Apr. 25, 2019)...........................22

*United States v. Cox*,
 906 F.3d 1170 (10th Cir. 2018) ..............................................................7, 12

*United States v. Cusaac*,
 No. 06-cv-1231, 2008 WL 4792682 (D.N.J. Oct. 30, 2008)................................22

*United States v. O'Brien*,
 560 U.S. 218 (2010).................................................................................16

*United States v. One (1) Palmetto State Armory PA-15 Machinegun*,
 822 F.3d 136 (3d Cir. 2016)........................................................16, 17, 21

*United States v. Rowson*,
 652 F. Supp. 3d 436 (S.D.N.Y. 2023) ...................................................43

*United States v. Stevens*,
 70 F.4th 653 (3d Cir. 2023) ....................................................................8

## Historical Laws

1763-1775 N.J. Laws 346, ch. 539 ..................................................31, 40

1784 Laws of N.Y. 627, ch. 28 ...............................................................42

1837 Ga. Acts 90 (1838)..........................................................31, 32, 40

1837-1838 Tenn. Pub. Acts 200-01, ch. 137 ............................................31

1850 Mass. Gen. Law, ch. 194................................................................31

Laws & Ordinances Governing the City of Chicago 239  (1866)...........................42

1879 Tenn. Pub. Acts 135–36, chap. 96 ...................................................32

1881 Ark. Acts 191, ch. XCVI .................................................................31

Illinois Act of Apr. 16, 1881, chap. 38 (1885) 88, § 1 ............................31

1888 Gen. Minn. Law § 333 .............................................................. 31, 32

1890 Okla. Sess. Laws 475, § 18 ...........................................................31

Ordinances of the City of Memphis, 1867, § 4747.................................32

## Statutes and Rules

18 U.S.C. § 922.......................................................................................16

N.J. Stat. Ann. § 2C:39-19 ................................................................9, 45

N.J. Stat. Ann. § 2C:39-20 ................................................................9, 45

Fed. R. Civ. P. 56 .............................................................................21-22

D.N.J. L. Civ. R. 7.1 ..............................................................................20

## Other Authorities

H.R. Rep. No. 90-1956 (1968)................................................................16

William Blackstone, 1 Commentaries on the Laws of England 140 (1765), http://tinyurl.com/m8tyz4a7 ..............................................................17

William Blackstone, 4 Commentaries on the Laws of England 55 (1769), http://tinyurl.com/4w7aawcy ...............................................................15

## PRELIMINARY STATEMENT

The Supreme Court has long cautioned that the Second Amendment does not grant the right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). To the contrary, to obtain an order invalidating New Jersey's longstanding laws restricting large-capacity magazines and assault weapons, Plaintiff must prove that these weapons are (1) "arms" that (2) are "'in common use' today for self-defense." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24, 28-29, 32 (2022). And even if they can satisfy those requirements, *Bruen* makes clear that where there is a "historical tradition of firearm regulation" restricting similar arms, the States can adopt similar firearms restrictions today—especially if the States are confronting new challenges "beyond those the Founders specifically anticipated." *Id.* at 28.

Plaintiffs defy each of these careful instructions. On Plaintiffs' reading of the Second Amendment, a weapon can never be banned—no matter how dangerous or how prone to misuse—so long as a sufficient total of Americans choose to buy one, even if that number represents far fewer than one percent of the total population. But adopting their view would mean that gun manufacturers and a tiny minority of gun owners (and an even smaller sliver of Americans) can insulate even the deadliest weapons from regulation. And under their view, no historical tradition could stand in the way—even traditions that date back to the ratification of the Second and

Fourteenth Amendments. That view lacks support in either logic or history, which is why neither *Bruen* nor *Heller* endorses it. Worse still, it is hopelessly circular: it turns the Second Amendment into a race between a minority of firearms owners' purchasing decisions and the People's enactment of firearms regulations.

A chorus of federal courts has thus hewed carefully to the Supreme Court's instructions to consider whether weapons are arms in common use, and to consider relevantly similar historical restrictions. And relying on that methodology, those courts have rejected Plaintiffs' claims many times over—including in decisions after the State filed its opening brief. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1194-95 (7th Cir. 2023), *pet. for reh'g en banc denied*, 2023 WL 8558180 (7th Cir. Dec. 11, 2023), *app. for injunction pending appeal denied*, 2023 WL 8635036 (Dec. 14, 2023); *Capen v. Campbell*, No. 22-cv-11431, __ F. Supp. 3d __, 2023 WL 8851005 (D. Mass. Dec. 21, 2023); *Brumback v. Ferguson*, No. 22-cv-3093, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023); *Nat'l Ass'n for Gun Rights v. Lamont* (*"NAGR"*), No. 22-cv-1118, __ F. Supp. 3d __, 2023 WL 4975979 (D. Conn. Aug. 3, 2023); *Or. Firearms Fed'n v. Kotek*, No. 22-cv-01815, __ F. Supp. 3d __, 2023 WL 4541027 (D. Or. July 14, 2023); *Hartford v. Ferguson*, No. 23-cv-5364, 2023 WL 3836230 (W.D. Wash. June 6, 2023), *Hanson v. District of Columbia*, No. 22-cv-2256, __ F. Supp. 3d __, 2023 WL 3019777 (D.D.C. Apr. 20, 2023); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.* (*"DSSA"*), No. 22-

cv-951, __ F. Supp. 3d __, 2023 WL 2655150 (D. Del. Mar. 27, 2023) ; *Or. Firearms Fed'n, Inc. v. Brown* ("*Brown*"), 644 F. Supp. 3d 782 (D. Or. 2022); *Ocean State Tactical LLC v. Rhode Island (*"*OST*"), 646 F. Supp. 3d 368 (D.R.I. 2022).

This Court should join that growing judicial choir and reject Plaintiffs' Second Amendment claims. First, LCMs are not "arms" within the historical meaning of the Second Amendment's text: they do not fit within the plain meaning of that term as then-understood, and they are not necessary to firearms' proper functioning. Second, neither LCMs nor assault weapons are "'in common use' today for self-defense," as the record evidence establishes. *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627). And third, the record demonstrates that the State's challenged statutes are part of an extensive historical tradition of regulating weapons that are particularly dangerous or susceptible to disproportionate criminal misuse. Plaintiffs offered no genuine issue of material fact on any of these issues, and their belated and extra-record sources are neither admissible nor relevant.

While the policy debate surrounding the appropriate restrictions on LCMs and assault weapons may be fierce, the answer to the constitutional question is clear. Consistent with the original scope of the Second Amendment and the Nation's consistent historical tradition, States may restrict access to weapons like LCMs and assault weapons that are used disproportionately to perpetrate the ever-growing

national trend of deadly mass shootings. This Court should therefore reject Plaintiffs' attempt to nullify that permissible choice and enter judgment for the State.

## **ARGUMENT**

## I.   **THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECOND AMENDMENT CLAIMS.**

Because the Second Amendment's "plain text" does not "cover[]" LCMs or assault weapons, it does not "presumptively protect[]" their possession. *Bruen*, 597 U.S. at 24. And even if the Second Amendment's text did cover LCMs and assault weapons, the State has amply "demonstrat[ed] that [the law] is consistent with the Nation's historical tradition of firearm regulation." *Id.* As courts across the country have held, either or both of *Bruen*'s steps dispose of this challenge.

### **A. The Second Amendment Does Not Protect LCMs Or Assault Weapons.**

To receive protection under the Second Amendment, the covered instruments must be (1) "arms" under the "normal and ordinary meaning" of the Amendment's text that are (2) "'in common use' today for self-defense." *Bruen*, 597 U.S at 20, 32 (quoting *Heller*, 554 U.S. at 576-77, 627). But LCMs are not "arms." And neither LCMs nor assault weapons are commonly used for self-defense.

### 1.   *Large-Capacity Magazines Are Not "Arms."*

Plaintiffs' LCM challenge runs headlong into the Second Amendment's text. As multiple courts have held, magazines are accoutrements, not arms. *See Capen*,

4

2023 WL 8851005, at *17-18; *Kotek*, 2023 WL 4541027, at *25-26; *OST*, 646 F. Supp. 3d at 384-88; *Brumback*, 2023 WL 6221425, at *8-10.

Indeed, the record evidence unequivocally establishes that, as a textual matter, LCMs are accoutrements, not arms. Plaintiffs do not—and cannot—dispute that arms under the Second Amendment are limited to "weapons of offence" that are "use[d] in wrath to cast at or strike another." *Heller*, 554 U.S. at 581. They do not dispute that the term "arms" was historically understood as distinct from "accoutrements," which are "accessories" or "ancillary equipment" to arms, and are not protected by the Second Amendment. Baron Rpt. ¶¶ 23, 25.[1] Plaintiffs also do not dispute that accoutrements included "cartridge boxes," or dispute that cartridge boxes and magazines share a common linguistic meaning as "ammunition container[s]." *Id.* ¶¶ 22, 68 (explaining "magazine" has been used to "mean[] a bullet storage container" since the 1860s); *see also* ANJRPC Reply 4 (describing a cartridge box as "a container for carrying around ammunition"). As a textual matter, the conclusion is clear: the word "magazine" describes a "holder of ammunition," and—like cartridge boxes before them—is historically understood as an accoutrement alone. *OST*, 646 F. Supp. 3d at 384-88.

---

[1] The State's expert reports are exhibits to ECF 184, Decl. of Daniel Vannella. *See also* ECF 183-2 at 1 n.1 (index of expert reports).

Because Plaintiffs cannot dispute this original, textual understanding of the right, they primarily make a functional argument rather than a textual one. The thrust of their argument is to dispute whether magazines are *functionally* equivalent to cartridge boxes. ANJRPC Reply 3-4. But that misses the point of *Heller*'s inquiry: to conduct a *textual* analysis to determine whether the Second Amendment's "words and phrases … used in their normal and ordinary ... meaning" include LCMs. 554 U.S. at 576. So what matters is whether the word "magazine" and the phrase "cartridge box" both describe an object that contains ammunition, thus constituting "accoutrements" and falling outside the historical meaning of the word "arms."

Said another way, the focus of this inquiry is what the constitutional words mean, not on whether "arms" and "accoutrements" technology have changed. *See, e.g.*, *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (finding stun guns fit the definition of "arms" even though they differ from arms at the Founding). In many instances, that approach will help Plaintiffs: in evaluating whether a modern-day handgun qualifies as an "arm" under the Second Amendment, courts do not examine whether the modern handgun *works* exactly as did historical firearms; rather, the relevant textual inquiry is whether the weapon is an "instrument[] that constitute[s] bearable arms." *Heller*, 554 U.S. at 582. But what is good for the goose is good for the gander: in determining if magazines are arms, the relevant inquiry is also whether the word "accoutrement" rather than "arms" encompasses magazines, not whether

modern magazines are identical in function to the historical ammunition containers. *Cf. United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself … Accordingly, it can't be a 'bearable arm' protected by the Second Amendment."). Because this is primarily a *textual* inquiry, Plaintiffs' arguments about differences in function are nonresponsive.

That said, even under Plaintiffs' functional rather than textual approach, their response falls short. Contrary to Plaintiffs' assertions in briefing, the State has introduced unrebutted record evidence showing that, historically "cartridge boxes" *did* encompass ammunition containers that *also* fed ammunition into firearms—like "modern magazine[s]." ANJRPC Reply 4. In 1869, just one year after the earliest documented use of the word "magazine" to refer to an ammunition container, *see* Baron Rpt. ¶¶ 22, 64, a newspaper account described a weapon being "fire[d] ... by turning a crank" and "remov[ing]" and "put[ting] ... in" "cartridge box[es]," *id.* ¶ 31(n). In other words, this historical example confirms that ammunition containers could also feed ammunition into firearms—establishing the *functional* link between cartridge boxes and magazines that Plaintiffs (wrongly) demand. *See* ECF 183-1, N.J. Br. 18 n.8; ECF 181, N.J. Opp. to ANJRPC Mot. to Exclude at 35-38.

And while Plaintiffs complain that this use of cartridge boxes is the only usage in which the cartridge box "is uniquely involved in the firing process," ANJRPC Reply 5, that usage only underscores the *linguistic* equivalency between cartridge

boxes and firearms. After all, even though "the term 'magazine' was available at the time to refer to an 'ammunition container,' ... the [newspaper] writer use[d] the apparently more familiar term 'cartridge box' here." Baron Rpt. ¶ 31(n). And that newer term would "gradually replac[e] the earlier term[]." *Id.* ¶ 68. To use Plaintiffs' own phrasing, the word "magazine" is a "linear descendant[]" of the phrase "cartridge box." ANJRPC Reply 17. At bottom, just as cartridge boxes are not historically understood as arms, neither are magazines.

Plaintiffs' other efforts to evade *Bruen*'s textual inquiry fail. First, Plaintiffs' insistence that the Third Circuit's prior statement about magazines constituting arms remains binding, ANJRPC Reply 5-6, never grapples with the State's arguments and the precedents on which it relied. As the State already explained, *Bruen*'s methodology conflicts with the Third Circuit's prior, functional treatment of magazines: the "historically-driven textual analysis of 'arms' the Supreme Court now requires" post-*Bruen* abrogated the Third Circuit's prior atextual rationale for calling magazines "arms." N.J. Br. 20-21 (citing *United States v. Stevens*, 70 F.4th 653, 657-60 (3d Cir. 2023)). And as the Third Circuit itself recently agreed, "*Bruen* abrogated [the circuit's] Second Amendment jurisprudence," thus calling for a fresh look at "whether the text of the Second Amendment applies to a person and his proposed conduct." *Range v. Att'y Gen.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc).

Second, Plaintiffs appear to acknowledge that LCMs are not necessary for a firearm to function, but illogically insist that so long as *some* magazines are protected because they are necessary for a firearm to operate, *all* magazines must be protected. ANJRPC Reply 6. But New Jersey's law in no way impinges on the ability to possess magazines necessary for firearms operation, as it allows firearm owners to purchase a wide range of magazines so long as they cannot fire more than 10 bullets without a pause to reload; permits users to simply modify the capacity of magazines that they already own; and even exempts firearms with built-in magazines that cannot be so modified. *See* N.J. Stat. Ann. §§ 2C:39-19, -20. Plaintiffs never disputed the record evidence that magazines with a capacity above 10 rounds are not themselves necessary for operability. N.J. Br. 19-20 (quoting Yurgealitis Rpt. ¶ 145 ("Generally speaking, any firearm designed to accept a detachable magazine holding more than 10 rounds will also accept a magazine with a maximum legal capacity under the statute.")); *Kotek*, 2023 WL 4541027, at *26 ("[LCMs,] as a subset of magazines, are never necessary to render firearms operable."). So, even under the theory that the Second Amendment protects those magazines "necessary to render . . . firearms operable," *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015), this specific LCM law does not cover any conduct protected by the Second Amendment.

Because magazines are not arms, and because firearms do not actually need LCMs to operate, LCMs fall outside the plain meaning of the right.

   2.    *Neither LCMs Nor Assault Weapons Are In Common Use For Self Defense.*

Plaintiffs' claims fail for a second reason: LCMs and assault weapons receive no Second Amendment protection because they are not "weapons 'in common use' today for self-defense." *Bruen*, 597 U.S. at 32.[2] A growing consensus of courts has rejected challenges to analogous laws on these grounds. *See, e.g.*, *Bevis*, 85 F.4th at 1192-97; *NAGR*, 2023 WL 4975979, at *19-26; *Kotek*, 2023 WL 4541027, at *25-34; *Hanson*, 2023 WL 3019777, at *7-12; *OST*, 646 F. Supp. 3d at 384-90.

Those courts are right. Although Plaintiffs assert that the mere fact that some number of these weapons have been *purchased* must suffice for Second Amendment protection, their "common ownership" theory misapprehends *Heller* and *Bruen*, is inconsistent with Third Circuit precedent, and has been consistently rejected by courts as illogical. Instead, the common-use test calls for an objective analysis of an instrument's features and actual use. Under that analysis, the record evidence is undisputed that neither LCMs nor assault weapons are commonly used for self-

---

[2] Plaintiffs erroneously argue that "common use" falls within *Bruen*'s second step and is thus one for which the State bears the burden. Cheeseman Reply 3-5. For one, *Bruen* itself assessed whether an arm was in common use *before* evaluating the historical tradition. *See* 597 U.S. at 32. For another, as the Seventh Circuit explained, this analysis fits comfortably within the first *Bruen* step as to the Second Amendment's original scope: "the definition of 'bearable arms' extends only to weapons in common use for a lawful purpose. That lawful purpose … is at its core the right to individual self-defense." *Bevis*, 85 F.4th at 1193; *see also id.* at 1193-94 (describing the context for why such an analysis determines the right's scope). In any event, even if the burden were on the State, the State has met it.

defense. In contrast to the handguns at issue in *Heller* and *Bruen*, these exceedingly dangerous weapons receive no constitutional protection.

        a.     <u>Courts Must Ask Whether A Weapon Is In Common Use For Self-Defense, Not Whether It Is Commonly Owned.</u>

The initial question is methodological: how to determine whether a particular arm is in fact commonly used for self-defense. This Court should reject Plaintiffs' claim that "the lynchpin of the 'common use test' is not actual use but possession." ANJRPC Reply 6; Cheeseman Reply 8. They insist that anytime sufficient numbers of an arm are sold, its possession becomes constitutionally protected, even if that weapon is *never* (or rarely) used for self-defense, and no matter how dangerous its features. *See* ANJRPC Reply 7 (arguing "how [people] actually end up using [the gun] if at all" is irrelevant). That position finds support in neither logic nor precedent.

As numerous courts have noted, Plaintiffs' position—that common *ownership* is the relevant test for Second Amendment protection—makes little sense. To adopt this view would mean no weapons may be restricted so long as an unspecified total number of Americans first make a "judgment in selecting the firearms they think are appropriate for lawful use" and swiftly buy it. ANJRPC Reply 9. But that would mean grenades, machineguns, short-barreled shotguns and rifles, and all manner of weapons not yet in existence merit constitutional protection so long as they are the subject of a successful advertising and purchasing campaign before the People can regulate them—no matter how dangerous or unsuitable for self-defense the weapons

are. *See Bevis*, 85 F.4th at 1194-95; *Capen*, 2023 WL 8851005, at *8. As the Seventh Circuit explained, "[i]t is not too much of a stretch to think that some people might like the fully automatic feature of a machinegun, if they were hoping to defend their families, their property, and themselves from invaders." 85 F.4th at 1195. The same logic would hold for grenades and short-barreled shotguns.

That would produce results directly at odds with Supreme Court precedents. If Plaintiffs' circulation-tally test governed, the Supreme Court would have reached the very conclusion it called "startling" in *Heller*: that the federal machinegun ban is unconstitutional, given that hundreds of thousands of machineguns exist legally within this country today. *DSSA*, 2023 WL 2655150, at *5; *see Heller*, 554 U.S. at 625 (holding explicitly that the Second Amendment does not protect machineguns and "short-barreled shotguns"); *see also Cox*, 906 F.3d at 1185. Plaintiffs themselves say that machineguns are "unusual … in American society" not because of numbers, but because they are "highly useful for suppressive fire in a war zone," and "disadvantageous for personal self-defense," ANJRPC Reply 10, the opposite of a circulation-tally-based approach. That a circulation-tally approach would establish the Second Amendment right to possess machineguns that *Heller* expressly rejected is a powerful indication that Plaintiffs' methodology is incorrect.

Nor is that the only problem with a counting-based test. As the Seventh Circuit (and multiple other courts) found, a circulation test rests upon "circular reasoning."

12

*Bevis*, 85 F.4th at 1190; N.J. Br. 36-38. Under Plaintiffs' test, the act of restricting a weapon would reduce how many are in circulation and therefore establish the constitutionality of the restriction—that is, the law would be the source of its own validity. *See id.* at 1195, 1198-99 (citing *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015)). The converse is equally shocking: it cannot be that "an entirely novel weapon that achieved rapid popularity ... [is] rendered beyond the reach of regulation if innovation and sales outstripped legislation." *Capen*, 2023 WL 8851005, at *8; *see also Bevis*, 85 F.4th at 1199 (noting that if courts "looked to numbers alone, the federal ban [on assault weapons] would have been constitutional before 2004 [when the ban expired], but unconstitutional thereafter," and this circulation approach is "lack[ing] both textual and historical provenance"). The Constitution is not an arms race between individual purchasers and state legislatures.

Plaintiffs' position is also inconsistent with precedent. *Heller* and *Bruen* held that the Second Amendment applies only to arms that are "'in common *use*' today *for self-defense*," *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627), not those "commonly owned." And the Court used that standard repeatedly in both cases. *See Heller*, 554 U.S. at 630 (noting Second Amendment protects right to "use [weapons] for the core lawful purpose of self-defense"); *Bruen*, 597 U.S. at 70 (noting Second Amendment protects right to carry in public "commonly used firearms for personal defense"). Plaintiffs can only argue that, "[u]nfortunately, the term 'common use' is

13

misleading." ANJPRC Reply 6. But it is not misleading at all; rather, Plaintiffs are adding their own gloss that the constitutional standard cannot bear.

Plaintiffs' efforts to collect various sentences from Supreme Court opinions and string together a contrary test fall short. *See Brown v. Davenport*, 596 U.S. 118, 141 (2022) (instructing litigants not to hunt "for stray comments [in court opinions] and stretch them beyond their context—all to justify an outcome inconsistent with this Court's reasoning and judgments"). For one, their focus on *Heller*'s comments that handguns are "overwhelmingly chosen by American society" and unprotected weapons are the weapons "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, 628-29, does not support a circulation-only test. After all, *Heller* was clear that handguns were projected not simply because a wide range of people purchased them, but because *objective characteristics* make them especially suitable as the "quintessential self-defense weapon": they are "easier to store in a location that is readily accessible in an emergency"; they "cannot easily be redirected or wrestled away by an attacker"; they are "easier to use for those without the upper-body strength to lift and aim a long gun"; and they "can be pointed at a burglar with one hand while the other hand dials the police." *Id.* at 629. Nowhere did *Heller* count how many handguns Americans possessed, let alone make counting the dispositive exercise. *See* Cheeseman Reply 13; ANJRPC Reply 12. Plaintiffs try to fill the gap by arguing that the *dissent* in *Heller* feared the opinion would lead to

14

an ownership-only test that would one day constitutionalize machinegun possession, Cheeseman Reply 13-14, but dissents often castigate majorities in broad terms, and "the *Heller* majority said nothing to confirm that it was sponsoring the [circulation] test." *Kolbe v. Hogan*, 849 F.3d 114, 141 (4th Cir. 2017) (en banc).

Plaintiffs' other efforts fall short, too. Plaintiffs argue that the Court has only excluded weapons that are *both* "dangerous and unusual" from Second Amendment protection, but they offer no principled reason for why "dangerous or unusual" must be read as a conjunctive test when early American courts did not see it that way. *See* N.J. Br. 55-56, n.16; *see also* William Blackstone, 4 Commentaries on the Laws of England 55, 149 (1769), http://tinyurl.com/4w7aawcy. And while Plaintiffs rely on a one-Justice concurrence supporting their view in *Caetano*, 577 U.S. at 417 (Alito, J., concurring), *see* ANJRPC Reply 21; Cheeseman Reply 28-29, concurrences are not "binding precedent," *Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997); *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 310 (3d Cir. 2013).[3] And even "[a]ssuming the term 'unusual'" is a separate requirement, its meaning must "derive at least in part from the essential purpose of the Second Amendment," *Capen*, 2023

---

[3] Nor does Plaintiffs' reference to *State v. Huntly*, help their cause, since *Huntly* expressly rejected Plaintiffs' argument that a weapon cannot be unusual because it is commonly owned. Cheeseman Reply 9. Instead, *Huntly* confirmed that even if "there is scarcely a man in the community who does not own" it, a firearm can nonetheless be an "unusual weapon." 25 N.C. 418, 422 (1843).

WL 8851005, at *10: that is, whether LCMs and assault weapons are "unusual for ordinary citizens to use for lawful purposes, particularly self-defense." *Id.*

The Third Circuit has thus declined to use a circulation test. In *United States v. One (1) Palmetto State Armory PA-15 Machinegun*, 822 F.3d 136 (3d Cir. 2016), the court upheld a ban on machinegun possession, 18 U.S.C. § 922(*o*), concluding that machineguns "are not in common use for lawful purposes" and are "exceedingly dangerous weapons." 822 F.3d at 142. The Third Circuit cited sources that described machineguns as "gangster-type weapons," "used principally by persons engaged in unlawful activities," and that happen to pose an "immense danger." *Id.* (quoting, *inter alia*, H.R. Rep. No. 90-1956, at 34 (1968); *United States v. O'Brien*, 560 U.S. 218, 230 (2010)). The Third Circuit did not try to count the number of machineguns in circulation, let alone make that total number dispositive. This Court should likewise "decline to base [its] assessment of the constitutionality of [New Jersey's assault weapons and LCM laws] on numbers alone." *Bevis*, 85 F.4th at 1198-99.

Instead, the proper test is what *Bruen* and *Heller* say: whether weapons are "'in common use' today for self-defense" reflects a straightforward inquiry into the weapons' actual use and operational suitability as "instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28, 32 (quoting *Heller*, 554 U.S. at 627). A wide array of courts has reinforced that conclusion post-*Bruen*, consistently assessing the "characteristics" of both LCMs and assault weapons and "how [they are] used by

everyday citizens" to see if they are indeed in common use for self-defense. *NAGR*, 2023 WL 4975979, at *14-15; *Kotek*, 2023 WL 4541027, at *26-34; *Hanson*, 2023 WL 301977, at *8-12; *OST*, 646 F.Supp.3d at 388-90. It is the approach consonant with the context of the Second Amendment, which was adopted to protect weapons "that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." *Bevis*, 85 F.4th at 1193-94 (finding support for this approach based on both contemporaneous dictionaries and "historical antecedents on which the Second Amendment was based"); *see also* William Blackstone, 1 Commentaries on the Laws of England *140 (1765), http://tinyurl.com/m8tyz4a7 (describing "the right of having and using arms for self-preservation and defence"). And this approach makes sense of the Supreme Court's and Third Circuit's precedents, which have endorsed a common *use* test and have long looked to the actual features of a weapon in describing why it is (handgun) or is not (machinegun) protected under the Second Amendment. *See, e.g.*, *Palmetto*, 822 F.3d at 142-43; *Bruen*, 597 U.S. at 28, 32; *Heller*, 554 U.S. at 627, 629. This Court should therefore reject Plaintiffs' invented circulation standard.

        b.    <u>There Is No Genuine Dispute That LCMs And Assault Weapons Are Not In "Common Use For Self-Defense".</u>

Properly understood, Plaintiffs fail to meet their burden of showing LCMs and assault weapons are in common use for self-defense. As the record sets out in detail,

the characteristics of LCMs and assault weapons make them particularly well-suited for militaristic combat and mass shootings, not self-defense. And the data confirm that while those instruments are rarely, if ever, used for self-defense, they *are* used disproportionately to commit mass killings. Plaintiffs do not dispute most evidence on these points, and their efforts to manufacture genuine disputes fail.

Begin with what Plaintiffs cannot and do not dispute: record expert evidence that LCMs and assault weapons were both designed for military use. *See* N.J. Br. 28-30 (citing expert declarations tracing development of AR-15 in the 1950s to meet military specifications and development of LCMs in World War II for combat use).[4] Indeed, weapons manufacturers marketed those instruments as militaristic in nature. *See* N.J. Br. 30 (citing sources). For good reason: like other military weapons, assault weapons were designed to be effective "at battlefield ranges of up to 500 yards," with high-velocity bullets, in conjunction with LCMs, able to more rapidly "inflict[] significant carnage." Br. 31 (quoting Yurgealitis Rpt. ¶¶ 137, 155-56). And when LCMs are used, "increasing the number of bullets that can be fired during a given time period," "the victim's wounds are typically more complex, carry a higher likelihood of injury requiring surgical intervention, and carry a higher likelihood of

---

[4] Plaintiffs gesture at a dispute about such instruments' "military heritage," ANJRPC Reply 14-15 (citing Hlebinsky Decl. ¶¶ 20-27), but nothing in that declaration—which focuses on antique weapons history from the 1400s to the Civil War—creates a genuine dispute of fact.

death." Hargarten Rpt. ¶¶ 30, 34. Plaintiffs admit that LCMs and assault weapons "fire[] faster" and "inflict[] more damage." ANJRPC Reply 15.

Plaintiffs also offer no genuine dispute regarding the notable overlap between assault weapons and M-16s—a fact other courts have found dispositive. As the State explained, and Plaintiffs offer no evidence to dispute, weapons like AR-15s share the same "effective range, muzzle velocity and semiautomatic rate of fire" as M-16s. N.J. Br. 29 (quoting Yurgealitis Rpt. ¶ 73); *see also* ANJRPC Reply 15 (admitting M-16s are "modern military arms"). Plaintiffs do not dispute that AR-15s and M-16s are identical on these characteristics. *See* ECF 195-2 ¶ 69; ECF 197-2 ¶ 69. As courts have found, that ends the inquiry: those combat-oriented characteristics show LCMs and assault weapons are not meant to receive Second Amendment protection. *See, e.g.*, *Bevis*, 85 F.4th at 1195 (rejecting similar claim because "assault weapons and [LCMs] are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense"); *NAGR*, 2023 WL 4975979, at *24-26 (adding "assault weapons and LCMs are more suitable for military use than civilian self-defense."); *Kotek*, 2023 WL 4541027, at *34 ("LCMs, even in civilian hands, are closely related to weapons used in warfare."); *Capen*, 2023 WL 8851005, at *14 (similar, as to AR-15).

Instead, such destructive instruments are unfortunately more useful for—and disproportionately used in—criminality and violence. As the expert record evidence

catalogues, while assault rifles constitute (at most) 3-5% of all firearms in civilian circulation, *see* Webster Rpt. ¶ 13, Klarevas Rpt. ¶ 14, they are used to commit, conservatively, 24% of mass shootings with 4 or more victim fatalities, *see* N.J. Br. 33 (citing Allen Rpt. ¶ 30). Assault weapons are used "in fatal mass shootings at percentages five to ten times higher than would be by chance or if weapon features played no role in these acts of violence." Webster Rpt. ¶ 13; *accord* Klarevas Rpt. ¶ 14. Yet "only 1 out of 456 active-shooter scenarios in the last 23 years involved a civilian intervening with an assault weapon." N.J. Br. 26-27 (citing Klarevas Rpt. ¶ 26). The statistics on LCMs are likewise stark: while they are used, conservatively, in 63% of mass shootings, they were used, at most, in only *two* of 1,000 self-defense incidents. *See* N.J. Br. 23-24, 33-34 (citing Allen Rpt. ¶¶ 18, 31).[5]

Multiple courts have emphasized the disproportionate use of assault weapons and LCMs in mass shootings relative to self-defense incidents in rejecting similar constitutional claims. *See, e.g.*, *NAGR*, 2023 WL 4975979, at *23-24 (confirming the fact that such instruments are "disproportionately used in mass shootings" shows

---

[5] The *Cheeseman* Plaintiffs make a drive-by attempt to exclude Lucy Allen's expert testimony. Cheeseman Reply 11-12. But parties cannot move for relief in opposition briefs, *see* L. Civ. R. 7.1(d)(1), and the time to file such a motion has long since passed. In any event, Plaintiffs' objections ring hollow. For one, they overlook that the results of Allen's NRA Armed Citizen Database study of reports from January 2011 to May 2017 were corroborated by results from two other studies: the NRA database from 1997-2001, and an independent analysis of news reports from Factiva. *See* N.J. Br. 24 n.8. And Plaintiffs offer no valid response to Professor Klarevas's study showing the rarity of assault-weapon use for self-defense. *See* Br. 25-27.

they "are commonly used for reasons other than lawful self-defense"); *Brown*, 644 F. Supp. 3d at 801 (same). In short, given those instruments' characteristics and actual use, they are "exceedingly dangerous" and "not in common use for lawful purposes," thus "fall[ing] outside the protection of the Second Amendment" altogether. *Palmetto*, 822 F.3d at 142-43.

Plaintiffs attempt to resist this conclusion in three ways, but none withstands scrutiny. *First*, Plaintiffs repeat a reference to *Staples v. United States*, 511 U.S. 600 (1994), ANJRPC Reply 11, 26, asserting that the Supreme Court has already deemed AR-15s constitutionality distinct from machineguns. But *Staples* did nothing of the sort: the decision "had nothing to do with Second Amendment, which is mentioned nowhere in the opinion," and came down "five months *before* Congress enacted the Federal Assault Weapons Ban, when as a matter of federal law it was lawful to own an AR-15." *Bevis*, 85 F.4th at 1194-95; *see also* N.J. Br. 40 n.13 (making the same point). And the *Staples* Court observed that the AR-15 "is the civilian version of the military's M-16 rifle," 511 U.S. at 603, an observation that plainly "reinforces" the proposition that assault weapons may be banned, *Bevis*, 85 F.4th at 1195.

*Second*, Plaintiffs argue that LCMs and assault weapons are commonly used for self-defense based on inadmissible sources, which also substantively fail to raise any genuine issue of material fact. For example, the *Cheeseman* Plaintiffs introduce on reply a hodgepodge of new documents, running afoul of Federal Rule of Civil

Procedure 56(c). *See* ECF 196 (attorney declaration with 124 new exhibits not produced in discovery); Cheeseman Reply 18-27, v-ix ("Other Authorities"); ANJRPC Reply v-vi. This contravenes all three of Rule 56(c)'s requirements, as they are proffered without the affiant's "personal knowledge"; no witness is "competent to testify on the matters stated" at trial; and they are hearsay not "capable of being admissible at trial." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 & n. 14 (3d Cir. 2016)). And they are untimely to boot. *Read v. Profeta*, 397 F. Supp. 3d 597, 648-50 (D.N.J. 2019) (striking untimely evidence from summary judgment declarations). This Court should disregard them. *See, e.g.*, *United States v. Cusaac*, No. 06-cv-1231, 2008 WL 4792682, at *3 (D.N.J. Oct. 30, 2008) (rejecting documents submitted for first time at summary judgment, which did not fit a hearsay exception); *Turicchi v. Quaid*, No. 18-cv-8908, 2019 WL 3213587, at *2 (C.D. Cal. Apr. 25, 2019) (refusing to consider attorney declaration attaching internet articles as inadmissible hearsay); *Instinet Inc. v. Ariek (UK) Ltd.*, No. 08-cv-7141, 2012 WL 4195391, at *6 (S.D.N.Y. Sept. 20, 2012); *Besett v. Hegg*, 890 F. Supp. 2d 1076, 1092 (D. Minn. 2012).

Nor should this Court accept Plaintiffs' invocation of "legislative facts" to escape these admissibility problems. *See* Cheeseman Reply 20, n.3. Legislative facts "are the basis for a rule of law," which "need not be relitigated in each succeeding case that invokes the rule and thereby indirectly relies on the legislative fact." *In re*

*Asbestos Litig.*, 829 F.2d 1233, 1249-50 (3d Cir. 1987) (Becker, J., concurring). But Plaintiffs' documents are not the "basis for the rule of law"; they are unsupported hearsay statements about common use whose truth and reliability are hotly contested. As another court explained, documents like the ones proffered by Plaintiffs are adjudicative, not legislative, facts as they "address factual questions that th[e] [c]ourt must answer, including the commonality of LCMs, their use by ordinary citizens, and the relevancy of certain historical firearms regulations." *Kotek*, 2023 WL 4541027, at *3 n.2; *see also id.* at *1 (emphasizing these documents that do not comply with federal rules "are not admissible to resolve disputed facts essential to the elements of Plaintiffs' claims").

In any event, Plaintiffs' untimely, inadmissible submissions are unpersuasive on the merits. Most obviously, introducing survey results or statements about why instruments are subjectively "chosen" by individuals for purchase, *see* Cheeseman Reply 20-27, ANJRPC Reply 13-14, does nothing to prove that assault weapons and LCMs are actually commonly *used* for self-defense—or whether their features better map on to the firearms the Supreme Court has found can be restricted. *See* N.J. Br. 40; *see supra* at 18-21. And Plaintiffs' unremarkable proposition that handguns are more often involved in crime than assault weapons, Cheeseman Reply 18, hardly supports their position either, as their own cited data shows that handgun ownership rates are magnitudes higher than assault weapons. *See* Klarevas Rpt. ¶¶ 11, 30-31.

And most fundamentally, their arguments are entirely unresponsive to the State's proofs that LCMs and assault weapons are designed for military use and are disproportionately used in mass shootings—not in instances of civilian self-defense. *See, e.g.*, *Bevis*, 85 F.4th at 1194-95; *NAGR*, 2023 WL 4975979, at *22-24.

*Third*, Plaintiffs improperly repackage their common-possession argument as a common-use one. Plaintiffs argue that because "the word 'bear' in the phrase 'keep and bear Arms' means 'being armed and ready for offensive or defensive action in a case of conflict,'" the Second Amendment's protections must "kick in [before] the moment a person is compelled to fire upon another person as a means of repelling force." Cheeseman Reply 7-8; *accord* ANJRPC Reply 7-9. Plaintiffs misunderstand the point: the right to being "armed and ready" for self-defense applies only to arms *protected by the Second Amendment*. Plaintiffs thus have no right to "keep and bear" unprotected arms. Nor, contrary to Plaintiffs' mangled analogy to seatbelts, *see* ANJRPC Reply 8 & n.1, does one use an arm for self-defense solely by owning it. A driver uses a seatbelt by "wear[ing]" it, *id.*, not by owning it. One can also use an arm "without firing any shots" by "threaten[ing]" another with it, Allen Rpt. ¶¶ 9, 17, but not merely by buying it. Indeed, the State's evidence *included* instances of brandishing—and *still* showed how rarely LCMs and assault weapons were used in

self-defense. Ultimately, the record is clear that they are not "in common use today for self-defense." *Bruen*, 597 U.S. at 32.[6]

### B. New Jersey's Laws Are Consistent With Historical Traditions.

While Plaintiffs' claims must fail because they cannot establish that the New Jersey laws implicate the Second Amendment in the first place, the State has shown as well that its laws fall within a historical tradition of firearms regulation. Plaintiffs' contrary arguments cannot be squared with the record or with *Bruen*. A wide range of courts have therefore upheld LCM and/or assault-weapons laws at *Bruen*'s second step as well. *See Bevis*, 85 F.4th at 1199-02; *Capen*, 2023 WL 8851005, at *11-16, 18-20; *Lamont*, 2023 WL 4975979, at *27-33; *Kotek*, 2023 WL 4541027, at *39-46; *Hanson*, 2023 WL 3019777, at *12-17; *DSSA*, 2023 WL 2655150, at *9-13.

> 1. *Unprecedented Societal Concerns and Dramatic Technological Changes Require Nuanced Analysis Of Historical Analogues.*

As an initial matter, *Bruen* is clear: if a law "implicat[es] unprecedented societal concerns or dramatic technological changes," courts should apply "a more nuanced approach" when assessing the potentially relevant historical analogues. 597

---

[6] Plaintiffs speculate that LCMs and assault weapons are commonly used for other purposes like hunting. *See* ANJRPC Reply 13; Cheeseman Reply 8-9. But there is no evidence in this record supporting that contention. Moreover, because the Second Amendment's "text is silent on hunting," it is an open question whether use in hunting would even be relevant. *Koons v. Platkin*, __ F. Supp. 3d __, 2023 WL 3478604, at *102 (D.N.J. May 16, 2023). Because self-defense is the Second Amendment's "central component," *Bruen*, 597 U.S. at 29, it follows that instruments cannot obtain constitutional protection based on ancillary uses.

U.S. at 27. This case presents two different "unprecedented societal concerns" and "dramatic technological changes." *Id.* As numerous courts have found, assault weapons and LCMs mark a "dramatic technological change" in the lethality of weaponry, *see id.* at 28 (recognizing the development of new arms "not in existence" at the Founding is a paradigmatic technological change), and present the "unprecedented societal concern" of mass shootings committed by a lone shooter. *See* N.J. Br. 47-52. Because early Americans would have had no reason to address challenges that did not exist, the inquiry of how the Second Amendment would have been historically understood in efforts to address those challenges must be conducted at a higher level of generality. *See Range*, 69 F.4th at 103 (confirming that laws addressing problems "unimaginable" to the Founders "need only be 'relevantly similar'" to historical analogues—not an exact fit).

Plaintiffs' insistence that these developments of the last two centuries have no relevance fails. First, they unconvincingly resist the idea that any meaningful technological change has taken place, citing the existence of repeating firearms in the 1800s and the invention of semiautomatic weapons in the 1880s. *See* Cheeseman Reply 36-38; ANJRPC Reply 16-18. But that ignores the significant record evidence establishing profound technological differences—in reload time, magazine capacity, accuracy, and capacity to cause catastrophic injury—between early guns and modern assault weapons and LCMs. *See* N.J. Br. 45-49, 53; Roth Rpt. ¶¶ 56-63; DeLay Rpt.

¶¶ 13-16, 70-82; Hargarten Rpt. ¶¶ 26-29, 32-34. And Plaintiffs introduce no evidence disputing that the Winchester Model 1866 "had to be manually reloaded, one round at a time," or that Volcanic Repeating Arms "were few, flawed, and experimental." Spitzer Rpt. ¶¶ 37, 42; *see* DeLay Rpt. ¶¶ 69, 75. Nor do they dispute that Founding-era single-shot guns suffered similar drawbacks. *See* N.J. Br. 44-45; Roth Rpt. ¶¶ 18-19; DeLay Rpt. ¶¶ 14-16, 37, 61; Spitzer Rpt. ¶¶ 30, 40.[7] Plaintiffs' bald claim that modern assault rifles are "linear descendants of the 'small-arms weapons used by militiamen,'" ANJRPC Reply 17, is thus belied by unanswered record evidence. *See, e.g.*, Roth Rpt. ¶¶ 58, 63; Spitzer Rpt. ¶ 29. Nor does describing one weapon as the purported linear descendant of another have constitutional significance: the automobile may be the linear descendant of the horse and buggy, but no one would deny it reflects a significant technological advancement.

Beyond the technological limitations, Plaintiffs do not genuinely dispute that repeating guns were rarely used by civilians before the late 19th century—and thus offered little need for government regulation. *See* N.J. Br. 45-47; DeLay Rpt. ¶¶ 5,

---

[7] Plaintiffs' focus on the caliber size of musket balls (Cheeseman Reply at 35) is misguided, given the undisputed evidence that bullets fired by AR-15 style rifles produce "significantly larger" cavities in human tissue than bullets fired by a musket (or even a Thompson submachine gun), particularly "when there are multiple bullet wounds." Hargarten Rpt. ¶¶ 25, 26, 28, 30, 34; *see* N.J. Br. 31, n.11. AR-15s "pair [a] high muzzle velocity with a comparatively low level of kinetic energy per round due to its relatively small bullet" to make it "uniquely dangerous." *Capen*, 2023 WL 8851005, at *15; *see also* Yurgealitis Rpt. ¶¶ 6, 55, 58, 62, 110, 137, 153.

8, 13-16, 20-24, 30-34, 51-53, 58-69; DeLay Corr. To Rebuttal Rpt. ¶¶ 1-2;[8] Spitzer Rpt. ¶¶ 30-44. That is true, again, for the Volcanic Arms and Winchester guns on which Plaintiffs rely, *see* ANJRPC Reply 16-17, but which the undisputed record evidence shows were not widely adopted. *See* Spitzer Rpt. ¶¶ 37, 42-43, 45. Indeed, Plaintiffs' best evidence of a repeating gun that was actually in widespread use is the semiautomatic M1911 handgun invented in 1911, *see* Cheeseman Reply 36; ANJRPC Reply 17, which only underscores that nothing comparable to modern assault rifles was prevalent in the 18th or 19th Centuries. At bottom, it is "beyond reasonable dispute" that "there has been a 'dramatic technological change'" between the weapons that were widespread in 1791 and 1868 and the "modern AR-15," given the latter's "radical increases in muzzle velocity, range, accuracy, and functionality." *Capen*, 2023 WL 8851005, at *12 (quoting *Bruen*, 597 U.S. at 27).

Second, Plaintiffs do not genuinely dispute that mass shootings by lone gunmen using assault weapons and LCMs are an unprecedented societal problem, but instead repeat a strawman argument: that armed conflict and homicide generally "are not novel phenomena." Cheeseman Reply 38; ANJRPC Reply 18-19 (same). But the mere fact that *groups* have historically clashed in armed conflict, or that individuals perpetrated individual murder via myriad means, is nonresponsive to the

---

[8] The State's moving brief (at 46) mistakenly stated that high capacity rifles made up less than 0.02% of firearms in 1872; the figure is 0.2%. *See* DeLay Corr. ¶¶ 1-2.

rise of mass shootings—including high-fatality mass shootings—by lone gunmen. *See* N.J. Br. 54-55. Indeed, Plaintiffs raise no genuine dispute regarding the evidence that early firearms technology drastically limited how much damage a single shooter could inflict, *see* DeLay Rpt. ¶¶ 60, 69, 90; Roth Rpt. ¶ 14; that mass killings by a lone shooter were non-existent before the 1900s,[9] *see* DeLay Rpt. ¶¶ 37, 74; Klarevas Rpt. ¶ 19; Roth Rpt. ¶ 47; that there has been an unprecedented rise in the frequency and toll of mass shootings in recent decades, *see* Allen Rpt. ¶¶ 39-41; Klarevas Rpt. ¶ 12-15; Webster Rpt. ¶ 17; or that the deadliest shootings in recent history were committed with assault weapons and/or LCMs, *see* Klarevas Rpt. ¶¶ 12-15, 22-23; Allen Rpt. ¶¶ 30-31, 39-40; DeLay Rpt. ¶ 60; Webster Rpt. ¶ 17. Indeed, Plaintiffs themselves stress that mass shooters often use "multiple firearms and magazines," Cheeseman Reply 40, which only confirms the State's point that assault weapons in conjunction with LCMs enable a single shooter to kill on an unparalleled scale.

Numerous courts have reached the same conclusion based on a similar record. *See, e.g., Lamont*, 2023 WL 4975979, at *29 ("mass shootings carried out with assault weapons and LCMs that result in mass fatalities are a modern societal

---

[9] Plaintiffs' focus on historical massacres by groups of people thus fails to create a genuine dispute of fact, *see* Cheeseman Reply 38-39, as this is *consistent* with the State's evidence that until the advent of modern firearms technology, an individual could not inflict mass casualties unless he was joined by a group of confederates. *See* Roth Rpt. ¶¶ 67-68.

problem"); *Kotek*, 2023 WL 4541027, at *37; *Herrera v. Raoul*, __ F. Supp. 3d __, 2023 WL 3074799, at *7 (N.D. Ill. 2023), *aff'd*, *Bevis*, 85 F.4th 1175; *Hanson*, 2023 WL 3019777, at *14; *DSSA*, 2023 WL 2655150, at *11. These courts were not engaging in "interest-balancing," nor (as Plaintiffs claim) is it an escape-hatch from *Bruen*'s overall historical analysis. Cheeseman Reply 33. Instead, these courts have sensibly recognized that the fact a State is confronting social problems "that were unimaginable at the founding" simply informs the level of similarity needed under *Bruen*'s analogical inquiry, because it informs how similar a Founding-era law could be expected to be. *Range*, 96 F.4th at 103; *cf. also McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (governments do not "regulate for problems that do not exist"). And the undisputed record evidence in this case supports their conclusions. In short, that New Jersey's statutes address novel regulatory challenges means that they need only be "relevantly similar" to historical regulations. *Bruen*, 597 U.S. at 28-29.

> 2.    *The State Laws Are Consistent With The Historical Tradition Of Regulating Particularly Dangerous Weapons.*

The State provided reams of historical evidence demonstrating a tradition of regulating specific weapons or accessories that posed a heightened public safety threat, while leaving open other avenues of self-defense. *See* N.J. Br. 55-67; *Bevis*, 85 F.4th at 1199 (crediting same "long-standing tradition of regulating the especially dangerous weapons of the time, whether they were firearms, explosives, Bowie knives, or other like devices"). Those historical measures were consistently imposed

once a weapon became widespread in society to the point that it posed a public safety threat through features that made it especially dangerous or particularly susceptible to disproportionate criminal misuse. And that through-line spanned from the pre-Founding era to the first regulations of automatic and semiautomatic weapons—the predecessors to the very LCMs and assault weapons at issue here.

Plaintiffs do not dispute the existence of a wide range of historical laws that prohibited specific weapons that were deemed especially dangerous or particularly susceptible to disproportionate criminal misuse, such as clubs, slung shots, pistols, and Bowie knives. *See* N.J. Br. 56-67 (highlighting record sources, citing, *e.g.*, 1763-1775 N.J. Laws 346, ch. 539, § 10 (banning trap guns); 1837-1838 Tenn. Pub. Acts 200, ch. 137, §§ 1, 2 (banning sale of Bowie knives and Arkansas tooth picks); 1837 Ga. Acts 90 (1838), § 1 (banning sale and possession of Bowie knives, dirks, sword canes, spears, and most pistols); 1850 Mass. Gen. Law, chap. 194, §§ 1, 2 (banning manufacture and sale of slung shots and metallic knuckles); 1881 Ark. Acts 191, ch. XCVI (96) §§ 1-3 (banning sale and transfer of dirks, Bowie knives, swords canes, spear canes, brass or metal knuckles, and most pistols); Ill. Act of Apr. 16, 1881, chap. 38 (1885) 88, § 1 (banning possession, sale, or transfer of slung shots, metallic knuckles, "or other deadl[y] weapon of like character"); 1888 Gen. Minn. Law § 333 (prohibiting manufacture, sale, or possession of slung shots, sand-clubs, and metal knuckles); 1890 Okla. Sess. Laws 475, § 18 (banning manufacture and sale of slung

shots and similar weapons); *see also* Ordinances of the City of Memphis, 1867, § 4747 (banning sale of Bowie knives, Arkansas tooth-picks, or similar knives or weapons) (cited at Spitzer Rpt. Ex. E, at 79); 1879 Tenn. Pub. Acts 135-36, ch. 96 § 1 (banning sale of pistols) (cited at *Bevis*, 85 F.4th at 1217 (Brennan, J., dissenting)). Plaintiffs cite no evidence indicating doubt as to "the lawfulness of such prohibitions." *Bruen*, 597 U.S. at 30; *see* N.J. Br. 69 (19th-Century cases approving such laws). Contrary to Plaintiffs' assertions, these laws did not only restrict public carry; a number of them prohibited possession and/or sale of these weapons. *See, e.g.*, 1837 Ga. Acts 90 (1838), § 1; 1888 Gen. Minn. Law § 333.

Faced with this mountain of record evidence, Plaintiffs first invite the Court to disregard *Bruen*'s historical framework altogether, arguing that anytime a weapon is sufficiently common, no amount of historically analogous evidence can support a modern-day restriction. *See* Cheeseman Reply 43-44; ANJRPC Reply 21. But that disregards half of *Bruen*'s framework, and it would mean that the Supreme Court's historically-grounded analysis would no longer actually be grounded in historical record evidence. *See Bruen*, 597 U.S. at 33-34, 38-39 (carefully considering whether a state law that fell within the Second Amendment's scope was still "justif[ied]" by the historical evidence); *Capen*, 2023 WL 8851005, at *10 (rejecting claim that the word "unusual" is a synonym for the "not 'in common use'" analysis). The historical record itself includes (*contra* Cheeseman Reply 43-44) restrictions on items even

after they had become commonly owned—such as Bowie knives. *See DSSA*, 2023 WL 2655150, at *11 (finding Bowie knives "proliferated beginning in the 1830s" and "[t]he 'craze' for these knives led to their widespread use in fights, duels, and other criminal activities"); *Capen*, 2023 WL 8851005, at *12 (likewise describing Bowie knives as "extensive and ubiquitous"); Spitzer Rpt. ¶ 61. In short, our Nation has never used commonality as the constitutionally dispositive test.

Plaintiffs' remaining methodological objections similarly misread *Bruen*. For one, Plaintiffs consider the historical fit at an improper level of generality. *See, e.g.*, *Antonyuk v. Chiumento*, 89 F.4th 271, 302 (2d Cir. 2023) (emphasizing that "courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction" and must avoid requiring "a distinctly similar historical regulation" rather than a relevantly similar one). New Jersey, for its part, has carefully heeded the instruction not to seek out a "regulatory blank check" based upon this "analogical reasoning." *Bruen*, 597 U.S. at 30. The State has thus not argued that merely being "dangerous" brings a firearm within the historical tradition; after all, all firearms are dangerous. Rather, the State adduced evidence of a historical tradition of regulating specific arms that are especially dangerous or that are susceptible to disproportionate criminal misuse. Not every modern weapon will fit within those bounds.

While the State avoided identifying too general a historical tradition, Plaintiffs have impermissibly responded by demanding that the prior statutes and modern laws be identical. Yet as *Bruen* held, the Second Amendment's historical inquiry is not "a regulatory straightjacket," and States need not identify a "historical *twin*" or "dead ringer" for their modern laws, so long as they can identify a "well-established and representative historical *analogue*." 597 U.S. at 30. Despite that warning, Plaintiffs insist the State identify historical "prohibitions on firearms with the kinds of features New Jersey singles out"—*i.e.*, "twins" of the modern law. ANJRPC Reply 25-26; *id.* at 27-28 (demanding evidence of a tradition of banning the precise "self-defense-enhancing features" at issue). They dismiss even past restrictions on "semiautomatic firearms" because these did not cover the same exact guns as the challenged law, *id.* at 26 (stressing "difference between" semiautomatic and automatic firearms), or tailored the statute slightly differently, *see id.* (distinguishing laws that "did not categorically prohibit the sale or possession of semiautomatics"). However, "the existence vel non of a distinctly similar historical regulation is not dispositive" under *Bruen*'s test—the question is whether the State has identified relevant *analogues*. *Antonyuk*, 89 F.4th at 303. Plaintiffs' granular objections thus entirely miss the point.

Next, Plaintiffs improperly ask this Court to disregard all evidence from "the mid-to-late 19th and 20th centuries"—no matter how established, no matter how analogous, and no matter that this evidence is part of one overall and longstanding

34

tradition—on the view that *Bruen*'s history-and-tradition inquiry *always* cuts off at the Founding era. *See* Cheeseman Reply 45. But *Bruen* said no such thing. The Court instead confirmed that where there is no direct conflict between these two periods, courts need not decide whether to rely on Founding- or Reconstruction-era evidence and can instead consider the evidence collectively as part of one long tradition. *See Bruen*, 597 U.S. at 35-36 (holding a consistent "course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases in the Constitution" (internal quotation marks omitted)); *Heller*, 554 U.S. at 605 (focusing on "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century"); *Gamble v. United States*, 139 S. Ct. 1960, 1966 (2019) (citing cases from 1847, 1850, and 1852 to construe Double Jeopardy Clause when no cases existed at the Founding addressing the issue); *Timbs v. Indiana*, 139 S. Ct. 682, 688 (2019) (citing a "consensus obtained in 1868 upon ratification of the Fourteenth Amendment" as evidence of understanding the Excessive Fines Clause). Plaintiffs themselves admit that post-1791 regulations inform the analysis except "to the extent they are '*inconsistent* with the original meaning of the constitutional text'" or "contradict[] earlier evidence" of the meaning of that text. Cheeseman Reply 45 (quoting *Bruen*, 597 U.S. at 36, 66).

Although the Third Circuit has found that the rule would be different when there is "daylight" between how the Founding and Reconstruction generations

"understood a particular right," there is no such daylight here. *Lara v. Comm'r*, No. 21-1832, 2024 WL 189453, at *8 n.14 (3d Cir. Jan. 18, 2024) (refusing to consider evidence of the latter after concluding the State had presented *zero* on-point historical evidence from the Founding). Instead, the State's historical evidence shows a continuous historical tradition, beginning with laws dating back to the colonial era, continuing through the Founding and the antebellum years, Reconstruction, and the turn of the 20th Century, all of which restricted certain weapons and accessories that were particularly dangerous or particularly susceptible to disproportionate criminal misuse after those weapons became widespread in society and posed a heightened threat to public safety. *See* N.J. Br. 55-67 (chronicling consistent body of history).

That is particularly so in this case, where the historical record reflects a series of consistent responses to the development and proliferation of *new weapons* that fit the overall longstanding tradition of regulation. Thus, for example, Plaintiffs err in arguing "twentieth-century regulations on semiautomatic firearms" are categorically irrelevant. Cheeseman Reply 46. Plaintiffs do not—and cannot—cite evidence that the Founders saw prohibitions on especially dangerous firearms generally as unconstitutional, even if they could not conceive of the specific firepower modern semiautomatic firearms could one day unleash. Rather, the widespread 20th-Century laws simply reflected another chapter in the long tradition, starting long before the

Founding, of restricting specific weapons and accessories that were particularly dangerous or particularly susceptible to disproportionate criminal misuse. *See* N.J. Br. 55-67. Said another way, it would have made no sense for States to regulate those semiautomatic and automatic arms in eras in which they did not yet exist, *see* Roth Rpt. ¶¶ 55-56; DeLay Rpt. ¶¶ 46-49, 81-82; States instead moved to swiftly regulate them once they grew widespread on the market and posed a public safety risk. *See Capen*, 2023 WL 8851005, at *19 (relying on the "early 20th century" magazine capacity limits where none of these early 20th century laws "contradicts earlier evidence"); *cf. Antonyuk*, 89 F.4th at 360 (relying on "late 19th century" laws to uphold location-based restrictions "[g]iven the continuity of the tradition of regulating firearms in crowded public forums" dating back to the Founding era).

Although Plaintiffs also claim "there are not enough" examples of particular Bowie knife and trap gun laws to establish a historical tradition, ANJRPC Reply 25, that is wrong both as a matter of methodology and as a matter of record evidence. As to methodology, Plaintiffs again mistake *Bruen*'s framework for a mere counting test. *Bruen* refused to rely "upon a single law" or a "handful of temporary territorial laws" if they "contradict[] the overwhelming weight of other evidence regarding the right to keep and bear arms." 597 U.S. at 65-66, 67-68. But absent "countervailing historical evidence," a dearth of laws in other States "distinctly similar to a proffered historical analogue does not command the inference that legislators there deemed

37

such a regulation inconsistent with the right to bear arms." *Antonyuk*, 89 F.4th at 303; *see also id.* at 301 (noting this approach makes sense because legislatures do not always "legislate[] to their constitutional limits"). So, while Plaintiffs allege that other jurisdictions "held that trap guns were legal to use," ANJRPC Reply 24, the fact that some States enacted different policies is simply the result of federalism, not evidence that the trap-gun bans that did exist were unconstitutional.[10]

In any event, the numerosity argument also fails on the evidentiary record in this case. The undisputed record shows that "nearly every state" maintained some form of restriction on Bowie knives, N.J. Br. 60 (citing Spitzer Rpt. ¶¶ 61, 67-68, & Ex. H); dozens of states restricted slungshots, Br. 61-62 (citing Spitzer Rpt. ¶¶ 74, 76 and collecting statutes); dozens also prohibited trap guns, Br. 58 (citing Spitzer Rpt. Ex. F); many prohibited certain forms of pistols, Br. 63 (citing DeLay Rpt. ¶ 70 & Spitzer Rpt. Ex. C); and nearly half of the States had restricted magazines and ammunition capacity, Br. 66 (citing Spitzer Rpt. ¶¶ 24-26; DeLay Rpt. ¶ 84). And Plaintiffs point to *no* conflicting evidence or judicial decisions suggesting such laws were thought to be unconstitutional. That so many States maintained restrictions on weapons like Bowie knives, slungshots, specific pistols, and trap guns indicates that

---

[10] Similarly, Plaintiffs say some of the Prohibition-era prohibitions on semiautomatic weapons "were either repealed entirely or replaced with laws regulating only fully automatic weapons," ANJRPC Reply 26-27, but adduce no evidence that repeals were based on constitutional concerns, rather than shifting policy attitudes.

modern-day restrictions on similarly dangerous weapons are allowed. *See Bevis*, 85 F.4th at 1200, 1201 (bans on sale of Bowie knives are evidence of "the long-standing tradition of regulating the especially dangerous weapons of the time").

Plaintiffs' other global attack on the evidentiary record—their claim that these laws were not sufficiently enforced, *see* ANJRPC Reply 25—fares no better. As an initial (and dispositive) matter, even though enforcement evidence is hard to come by, there *is* historical evidence that these measures were enforced. *See, e.g., Aymette v. State*, 21 Tenn. 154, 155 (1840) (affirming conviction under 1837 Bowie-knife law and upholding statute against constitutional challenge). But more importantly, a Legislature's belief at the Founding or Reconstruction that it could enact a given regulation is strong evidence that it was originally understood to be constitutional. And Plaintiffs point to no evidence that Bowie knife laws were disregarded, or that officers declined to enforce them due to constitutional concerns. So although a lack of enforcement could be the nail in the coffin for a weak analogy, *see Bruen*, 597 U.S. at 58 n.25, it cannot undermine otherwise forceful statutory evidence.

Plaintiffs' residual attacks on specific pieces of record evidence fall short. For example, Plaintiffs myopically focus on a subset of the State's cited historical laws that banned public carry of certain firearms, arguing that restrictions on carry can never support a possession ban. *See* ANJRPC Reply 22; Cheeseman Reply 46. Once again, Plaintiffs are wrong as a matter of record and doctrine. As to the former,

Plaintiffs misread the record evidence, which includes not only historical laws that barred public carry but also laws that prohibited possession entirely or banned sale or transfer. *See supra* at 31-32; *see also* 1763-1775 N.J. Laws 346, ch. 539, § 10 (banning trap guns); 1837 Ga. Acts 90 (1838), § 1 (banning sale and possession of Bowie knives, dirks, sword canes, spears, and certain pistols).

As to the latter, Plaintiffs' position ignores the core question: whether the analogue works a comparable burden *on the right to self-defense. See Bruen*, 597 U.S. at 38, 50, 60. As courts have found, even carry restrictions on Bowie knives, pistols, and the like imposed an "outright prohibition on the concealed carrying of an item that is commonly used in self-defense" that is "*more burdensome*" than restrictions on the purchase and carrying of an item that is almost never used in self-defense situations." *Kotek*, 2023 WL 4541027, at *43; *see id.* (finding that laws "prohibiting or limiting concealed carry of revolvers burdened the right to armed self-defense to a much greater degree than [Oregon's] restrictions on LCMs" given that "LCMs are not commonly used in self-defense"); *DSSA*, 2023 WL 2655150, at *12 (agreeing that assault-weapon and LCM laws "do not impose a greater burden on the right of armed self-defense than did analogous historical regulations" that imposed "blanket restrictions on the carry of entire categories of weapons").[11]

---

[11] *Nunn v. State*, 1 Ga. 243 (1846), is not to the contrary, as it partially invalidated a law barring the open carrying of a range of weapons precisely because it did not leave sufficient avenues to self-defense. *See id.* at 251. New Jersey's assault-

Others of Plaintiffs' objections rest on misreading of the record. For example, contrary to Plaintiffs' view, trap guns *were* used for self-defense. *See* Spitzer Rpt. ¶ 80 (noting trap guns were used for "purposes of defending property from intruders"). But because trap guns also had the disproportionate propensity to "hurt[] or kill[] innocents," notwithstanding the legitimate use against "thieves or criminals," a range of States elected to ban them in the 18th and 19th centuries. *Id.* ¶¶ 80-82; *see id.* Exs. B & F (compiling restrictions). As one court explained, laws restricting possession of LCMs and trap guns—both instruments that "take[] a firearm and make[] it more lethal"—are relevantly similar because both kinds of restrictions "seek to regulate a particularly dangerous feature of a firearm." *Kotek*, 2023 WL 4541027, at *40; *see also Hartford*, 2023 WL 3836230, at *4, 6 (finding "convincing[]" that modern assault weapons law and the historical restrictions—including restrictions on trap guns—did impose "'comparable burdens' on the right of armed self-defense, and those burdens are 'comparably justified'"). In other words, the "how" (restricting possession or use of a particularly dangerous weapon without impinging other avenues of self-defense) and "why" (to address the feature that renders the arm dangerous) are comparable.

---

weapons and LCM laws plainly allow for considerable forms of self-defense, as they only regulate weapons never or hardly ever used in self-defense.

Plaintiffs next draw inapposite distinctions between the historical gunpowder regulations and the challenged laws. Like the gunpowder laws, the LCM law does not "*blanketly* prohibit" certain quantities of ammunition or "compel forfeitures" of LCMs. Cheeseman Reply 47. Instead, New Jersey law restricts the lawful capacity of a single magazine while allowing non-compliant magazines to be modified (rather than forfeited), leaving any individual free to purchase as many legal magazines or bullets as he wishes. *See Kotek*, 2023 WL 4541027, at *40 ("Like the gunpowder laws, [an LCM ban] does not prohibit an individual from purchasing ammunition or amassing firepower; it merely limits the amount of firepower that an individual can amass and use without reloading."). In that relevant respect, the gunpowder laws similarly restrict how much gunpowder may be aggregated at a given place and time. *See, e.g.*, 1784 Laws of N.Y. 627, ch. 28 (limiting quantity of gunpowder that could be kept "in any one place" to twenty-eight pounds, to be separated into canisters of no more than seven pounds each); Laws & Ordinances Governing the City of Chicago 239 (Myers & Chandler 1866) (allowing "one pound of gunpowder or gun-cotton at one and the same time" per person) (cited at N.J. Br. 59). The "how and why" underlying each law is thus similar: states restricted the amount of gunpowder and ammunition that may be contained in the same space or device to reduce the risk of severe public harm. *Bruen*, 597 U.S. at 28-29. That the harm is not *identical* across

42

gunpowder and LCM laws does not undermine the analysis, since courts are charged with a nuanced analogical comparison, not a search for dead ringers.[12]

The historical record shows that New Jersey's restrictions on assault weapons and large-capacity magazines are part of a long historical tradition. For centuries, States responded to threats to public safety posed by weapons that were particularly dangerous or particularly susceptible to disproportionate criminal misuse by placing significant restrictions on those particular weapons, while leaving open other avenues of armed self-defense. That is precisely what New Jersey's laws do today.

## II.  THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON *ANJRPC*'S TAKINGS CLAIM.

The ANJRPC Plaintiffs do not dispute that binding Third Circuit precedent has rejected this Takings Clause claim. *See ANJRPC v. Att'y Gen. of N.J.* ("*ANJRPC I*"), 910 F.3d 106, 124-25 (3d Cir. 2018). Instead, they strangely claim that the usual rule that courts within the Third Circuit are bound by the Third Circuit panel

---

[12] Finally, Plaintiffs' charge that two historical regulations of clubs reflect racism, ANJRPC Reply 24, also does nothing to defeat summary judgment. As an initial matter, the State prevails even without these two historical laws, given the dozens of other historical regulations of clubs and dozens of regulations of other dangerous weapons. Moreover, while historical laws that discriminated based on race should and thankfully would be swiftly invalidated on equal protection grounds if enacted today, that does not make them historically irrelevant for determining the scope of the Second Amendment's substantive right. *See United States v. Rowson*, 652 F. Supp. 3d 436, 466 (S.D.N.Y. 2023) (reaching same conclusion and noting that "the Second Amendment's inquiry into historical analogues is not a normative one"); *Kanter v. Barr*, 919 F.3d 437, 457-58 (7th Cir. 2019) (Barrett, J., dissenting) (same).

decisions "has no application here." ANJRPC Reply 28. That is wrong: this Court is "bound by precedential opinions" of Third Circuit panels "unless they have been reversed by an *en banc* proceeding or have been adversely affected by an opinion of the Supreme Court." *Garcia v. Att'y Gen. of U.S.*, 553 F.3d 724, 727 (3d Cir. 2009) (citing *In re Continental Airlines*, 134 F.3d 536, 542 (3d Cir. 1998)).

*ANJRPC I* remains binding. *See ANJRPC v. Att'y Gen. of N.J.* ("*ANJRPC II*"), 974 F.3d 237, 245-46 (3d Cir. 2020) (recognizing that *ANJRPC I* conclusively resolved this takings claim). And nothing in *Bruen* or in any Third Circuit en banc decisions has touched on, let alone reversed or adversely affected, Plaintiffs' *Fifth* Amendment claim, as opposed to the Second Amendment claim. *See, e.g.*, *OST*, 646 F. Supp. 3d at 398 n.42 (emphasizing *Bruen* did not affect takings law). This Court is bound by the Third Circuit's opinion rejecting the very same takings claim brought by the same plaintiffs against the same state law.

In any event, Plaintiffs' arguments are substantively unresponsive. For one, they offer no response to the fact that New Jersey's law is not a taking, but a valid exercise of the State's police powers. *See Mugler v. Kansas*, 123 U.S. 623, 668 (1887) (a "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot … be deemed a taking."). Rather than serving an economic purpose, the statute "seeks to protect public safety and therefore [] is not a taking at all," as "[a]

compensable taking does not occur when the state prohibits the use of property as an exercise of its police powers rather than for public use." *ANJRPC I*, 910 F.3d at 124 n.32. That is dispositive.

For another, Plaintiffs' reliance on physical invasion cases, like *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), is unavailing, because *Loretto* defines a taking as a "permanent physical occupation," *id.* at 432, which the instant law is not. And in contrast to *Horne*, in which "[a]ctual raisins [were] transferred from the growers to the Government," thus divesting growers of "the entire 'bundle' of property rights," *Horne v. Dep't of Ag.*, 576 U.S. 351, 361-62 (2015), New Jersey's law, "does not involve a taking for government use in any way." *ANJRPC I*, 910 F.3d at 124 n.32. It leaves LCM owners with a series of voluntary options, including to modify the magazine or register any LCMs that cannot be modified. *See* N.J. Stat. Ann. §§ 2C:39-19, -20. Since New Jersey's "alternatives" mean the statute "does not require" surrendering an LCM to the State, this is yet one more reason no taking occurred here. *ANJRPC I*, 910 F.3d at 124.

## CONCLUSION

This Court should enter summary judgment for the State.[13]

---

[13] While Plaintiffs note that the Gloucester and Ocean County Prosecutors did not file separate summary-judgment papers, Cheeseman Reply 48, the State's November 3, 2023 filings were on behalf of all state defendants, including the prosecutors.

Dated:  January 19, 2024        Respectfully submitted,

                               MATHEW J. PLATKIN
                               ATTORNEY GENERAL OF NEW JERSEY

By:    */s/ Daniel M. Vannella*
                               Daniel M. Vannella
                               Assistant Attorney General